STATE

v.

Willie TURNER.

No. 87–40–C.A.

Supreme Court of Rhode Island.

June 29, 1989.

James E. O'Neil, Atty. Gen., J. Scott Kilpatrick, Jeffrey J. Greer, Jane M. McSoley, Asst. Attys. Gen., for plaintiff.

Richard Casparian, Public Defender, Barbara Hurst, Paula Rosin, Asst. Public Defenders, for defendant.

## OPINION

SHEA, Justice.

This case comes before the Supreme Court on appeal by the defendant, Willie Turner, after his conviction in the Newport County Superior Court on two of three counts of unlawfully breaking into and entering a dwelling house in violation of G.L. 1956 (1981 Reenactment) § 11–8–2, as amended by P.L.1985, ch. 426, § 1. Acquitted on one count, the defendant was sentenced to ten years on each of the two remaining counts—seven years to serve, three years suspended, and three years' probation upon release—sentences to run concurrently. We affirm.

On appeal defendant claims that the trial justice erred by refusing to suppress two out-of-court identifications. The defendant also claims that the trial justice erred by refusing to pass the case and by failing to give a cautionary instruction following improper comments by the prosecutor during his closing arguments.

On August 18, 1985, at approximately 6 p.m., Washington Irving was at home in his

study at 77 Rhode Island Avenue in Newport when his babysitter told him that someone was in the house. As Mr. Irving left his study to investigate, he confronted a male stranger in the hallway. When asked what he was doing there, the stranger responded by asking Mr. Irving if he had any apartments to rent. Mr. Irving said that he had no apartments and told the stranger to leave. The man then left the way he had entered, through a rear storm door that had been closed but not locked. Mr. Irving noted that this was an odd point of entry for an apartment hunter to use because, to get to that door, that person would have to walk past two other doorways at the front and side of the house and pass through a closed gate that is latched on both sides. Mr. Irving described the intruder as a thin black male, approximately five-feet-five-inches tall, wearing a black T-shirt and jeans. Three days later, on August 21, Mr. Irving identified the intruder from a police photo array as Willie Turner.

On the morning of August 11, 1985, Elizabeth Munoz was in her bathroom at 47 Franklin Street in Newport when she heard someone enter her second-floor apartment. Assuming it was her husband, Mrs. Munoz left her bathroom to find a male stranger standing in her living room. The stranger asked if the restaurant on the first floor of the building was hiring. Mrs. Munoz said that she had nothing to do with the restaurant and that he would have to check downstairs. The stranger left. Mrs. Munoz later reported the incident to an auxillary police chief.

Ten days later, on August 21, 1985, Mrs. Munoz answered a knock on her door. When she asked who it was, a male voice answered, "Butch," Mrs. Munoz's husband's name. However, when she opened the door, she saw the same black male that she had seen in her apartment on August 11. Closing the door quickly, Mrs. Munoz went to her window where she subsequently observed the stranger standing between two houses about one-half block away. Mrs. Munoz reported the incident to the police and described the intruder as a skinny black male, approximately twenty-five

years old, sporting a rough-looking beard and mustache and wearing gray jogging pants, a white T-shirt, and a maroon-wool ski cap.

That same day, at approximately 1 p.m., Ruth Saunders was sitting at her desk in the second-floor hallway of her apartment, which occupies the second and third floors over her Christmas ornament shop at 22 Mill Street in Newport. As she was working, Mrs. Saunders heard someone quietly ascend the stairs from the shop on the first floor. Thinking that the footsteps belonged to her son, Mrs. Saunders paid no attention and continued with her work. However, as the footsteps proceeded up another flight of stairs, to the third floor, Mrs. Saunders noted that the footsteps were unusually soft. This fact attracted her attention so that when the footsteps began their descent a minute or two later, Mrs. Saunders looked up from her work to see who was there. When she turned from her desk she confronted a male stranger whom she described as being between five-feet-six and five-feet-eight-inches tall, black, with brown eyes, approximately 145 to 155 pounds, unshaven, wearing a white T-shirt, dark pants and a maroon knitted-wool winter cap. When asked what he was doing up on the second floor, the stranger replied that he had come up to see if there were any more party decorations. When Mrs. Saunders offered to show him the way out, the stranger responded that he knew the way out and then ran down the stairs and out of the building. Suspecting that the strange intruder had been "casing" her apartment, Mrs. Saunders immediately called the police.

That afternoon at approximately 3 p.m. a Newport police officer observed and detained a suspect matching the two descriptions given earlier that day by Mrs. Munoz and Mrs. Saunders. The suspect identified himself as Willie Turner. At this time two police cruisers were dispatched to bring Mrs. Munoz and Mrs. Saunders to the scene to identify the suspect. Upon seeing the suspect, both women immediately identified him as the stranger they had seen in their apartments. The defendant was then

placed under arrest and charged with three counts of breaking and entering.

Prior to trial defendant moved to suppress the identifications in all three charges. The defendant's motion was denied, and subsequently he was convicted on the Irving and Munoz charges and acquitted on the Saunders charge. On appeal defendant contends that the showup identifications conducted with Mrs. Munoz and Mrs. Saunders were unnecessary and suggestive and that the trial justice erred by refusing to suppress the evidence of these two out-of-court identifications. We disagree.

Even though such practices have been widely condemned, both the United States Supreme Court and the Rhode Island Supreme Court have refused to create a per-se exclusionary rule barring the use of evidence of out-of-court identifications in situations in which suspects are shown individually to witnesses for the purpose of identification. *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199, 1206 (1967); *State v. Delahunt,* 121 R.I. 565, 573, 401 A.2d 1261, 1265 (1979). Instead both courts have held that a defendant's claim that a showup identification was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [defendant] was denied due process of law" must be viewed in light of the "totality of the circumstances surrounding [the identification]." *Stovall,* 388 U.S. at 302, 87 S.Ct. at 1972, 18 L.Ed.2d at 1206; *Delahunt,* 121 R.I. at 573, 401 A.2d at 1265. An inflexible per-se rule of exclusion would often frustrate rather than promote justice in situations wherein an identification is reliable despite its unnecessarily suggestive nature; therefore, the Court has developed and upheld a five-factor, ad-hoc, totality-of-the-circumstances test to determine whether a suggestive-identification procedure is reliable or inclined to give rise to a substantial likelihood of irreparable misidentification. *Manson v. Brathwaite,* 432 U.S. 98, 112–15, 97 S.Ct. 2243, 2252–54, 53 L.Ed.2d 140, 153–55 (1977); *Neil v. Biggers,* 409 U.S. 188, 198–200, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401, 410–11 (1972). The factors to be considered are these:

> "[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation." *Biggers,* 409 U.S. at 199–200, 93 S.Ct. at 382, 34 L.Ed.2d at 411 (as adopted by *Delahunt,* 121 R.I. at 573, 401 A.2d at 1266).

It is important to note that in these situations the main issue before the court is the reliability of the suggestive identification itself, not its relative reliability as compared to a lineup or other less suggestive type of identification. *Biggers,* 409 U.S. at 199–200 & n. 6, 93 S.Ct. at 382 & n. 6, 34 L.Ed.2d at 411 & n. 6.

The *Stovall, Biggers, Brathwaite* line of decisions adopted in *State v. Delahunt* have been followed numerous times in Rhode Island. In the present case we find that the identifications in question meet the *Biggers* totality-of-the-circumstances test and were properly admitted by the trial justice.

1

## The Opportunity to View

Both Mrs. Munoz and Mrs. Saunders testified that their original views of defendant during the crimes were unobstructed, face-to-face confrontations in good light. Therefore, the only question in regard to whether these witnesses had adequate opportunities to view concerns the duration of those views.

Mrs. Munoz viewed defendant on two separate occasions prior to her identification. During her first view, on August 11, 1985, she testified that she observed and conversed with defendant at a distance of two to three feet for approximately three minutes. Mrs. Munoz's second opportunity to view, on August 21, 1985, lasted only a few seconds before she recognized the stranger and quickly closed her door to prevent him from reentering her apartment. However, she also testified that she

was able to observe defendant from her window for several moments after he had left her apartment and walked down the street. Mrs. Saunders testified that she observed defendant from a distance of about twenty feet for thirty to forty seconds.

Although both witnesses' fairly brief opportunities to view defendant are of concern, we must weigh this factor against the remaining factors in the *Biggers* test before we make a final determination regarding the possibility for misidentification.

### 2

### *The Degree of Attention*

Both witnesses had their attention completely focused on defendant at the time of their views. Each woman encountered defendant in a one-on-one situation involving a brief conversation without other distractions to divert her attention. Furthermore, we find that the circumstances of each view, involving the sudden discovery of a stranger in one's home, are of such a nature that the witnesses' instinctive reactions would be to focus their complete attention on the stranger to try and determine whether they knew the stranger or his purpose in being someplace he was not supposed to be. This special degree of attention indicates that both women were more than casual observers. *Biggers,* 409 U.S. at 200, 93 S.Ct. at 382, 34 L.Ed.2d at 412; *Delahunt,* 121 R.I. at 573, 401 A.2d at 1266; *see also State v. Parker,* 472 A.2d 1206, 1209 (R.I.1984) (perpetrator and witness's one-on-one contact allowed witness to direct her full attention toward him).

### 3

### *The Accuracy of the Description*

Even though each witness's view of defendant during the crimes on the day of his identification lasted less than one minute, the descriptions were nearly identical and were so accurate that the police were able to locate and detain defendant within a matter of hours after the initial confrontations. Both women described defendant as a black male, lean in build, approximately five-feet-six to five-feet-nine-inches tall, having a rough-looking, untrimmed beard and mustache and wearing a knitted maroon-wool winter hat, a white T-shirt, and either gray or dark pants. In addition Mrs. Munoz described the stranger as being about twenty-five years old, and Mrs. Saunders added that he had brown eyes. These descriptions strongly support the reliability of the identifications. Their detail shows that the witnesses did indeed have a high degree of attention focused on defendant and that both witnesses had a sufficient opportunity to view defendant so as to make a reliable identification several hours later despite the short duration of their views.

### 4

### *The Level of Certainty*

At trial and at the pretrial motion to suppress, both women, without hesitation, stated that they were able to recognize and identify defendant immediately upon seeing him at the showup. At the time the identifications were made, both women stated that they had no doubts that the man in police custody was the person they had seen in their apartments.

### 5

### *The Time Between the Crime and the Identification*

In each case the showup identifications were made within hours of the witnesses' encounters with defendant. Thus the witnesses' memories were fresh and at the peak of their reliability.

Therefore, even though both witnesses only had a limited time to view defendant, the good conditions under which the views were made, the accuracy of the descriptions, and the short time between the crimes and the identifications all support the proposition that these identifications were reliable. Furthermore, from the record we do not believe that the police contributed any additional suggestiveness through their conduct of the showups. Given the totality of the circumstances as established by these factors, we find that the showup identifications made by these witnesses were sufficiently reliable and safe from the danger of misidentification as to be admissible as evidence.

Next defendant argues that the trial justice erred in refusing to pass the case and in refusing to give a cautionary instruction after some allegedly improper remarks by the prosecutor during closing arguments. Although we find the prosecutor's remarks improper, we also find the trial justice's failure to pass the case or to give a cautionary instruction do not warrant a new trial.

During his closing arguments the prosecutor referred to the Saunders breaking and entering and the absence of Mrs. Saunders's husband as a witness at the trial, saying:

> "Where is Mr. Saunders? Why didn't we hear from Mr. Saunders? * * * That's what I thought the last time, every time we have come into that room [the courtroom], that door has been open. That door has been open. The State doesn't have a lock on that door. The fact that we didn't hear from Mr. Saunders, does that help you decide anything? Why should you speculate that he might have said he was in the store or he wasn't in the store? Why should you speculate what Mr. Saunders might have said? Mrs. Saunders said he was downstairs and he saw the guy running out the door. What would Mr. Saunders have told you? Why should you even speculate? Does that help you decide anything?"

Rhode Island case law has long condemned statements or actions by prosecutors that give even the appearance of alluding to a defendant's failure to take the stand, call witnesses, or produce evidence. Because the state, not the defense, has the burden of proof in a criminal case, a defendant may properly comment on the prosecution's failure to call witnesses to show that the state has failed to meet its burden to prove a defendant guilty. *State v. LaPointe*, 525 A.2d 913, 914 (R.I.1987) (citing *State v. White*, 512 A.2d 1370, 1374 (R.I. 1986)). The prosecution, however, may not respond in kind. *Id.* Therefore, although the prosecution may properly comment on the evidence that the defense has brought into the record, *State v. Summerour*, 107 R.I. 42, 46, 264 A.2d 329, 331 (1970), "any time a prosecutor stresses the defense's failure to present testimony, he is engaging

in a type of brinkmanship that could cause a reversal and a retrial." *State v. Jefferson*, 116 R.I. 124, 137, 353 A.2d 190, 198 (1976).

When an improper comment is made by the prosecution, upon request, the defense is entitled to a cautionary instruction. *Id.* at 140, 353 A.2d at 199. Such an instruction, if timely and adequate, is considered an effective correction to an improper reference to the "empty chair." *State v. Taylor*, 425 A.2d 1231, 1235 (R.I.1981). However, a failure immediately to request a cautionary instruction at trial will be fatal to defendant on appeal. *LaPointe*, 525 A.2d at 914–15.

In this case, defense counsel signaled her objection to the trial justice when the objectionable comments were made; however, she withheld voicing her objection until after the prosecutor had completed his closing argument. After the prosecutor's closing argument, it being late on a Friday afternoon, the trial justice dismissed the jury before asking for defense counsel's objection. Counsel then stated her objection and requested that the trial justice pass the case—or at least give a cautionary instruction. The trial justice refused to pass the case but withheld his ruling on a cautionary instruction until Monday even though his initial reaction was that the comments were not so improper as to warrant reraising them with a cautionary instruction. The trial justice never ruled on the cautionary instruction, nor was any further action on the motion requested by defendant.

The state makes three primary arguments against defendant's appeal on this issue. First, the prosecutor's language was not improper; second, defendant's objection at the end of the prosecutor's closing was not timely; and finally, defendant's failure to reraise her objection on Monday was fatal to the appeal. We disagree.

■ The prosecutor's statements inquiring why Mr. Saunders did not testify were improper. His comments to the jurors about the state's not having a lock on the

courtroom door and about whether Mr. Saunders's absence helped them to decide anything clearly imply that the state was not preventing the defense from putting Mr. Saunders on the witness stand and that the jury might be able to infer something from his absence. Such statements are an unacceptable infringement on any defendant's right not to present evidence or witnesses and normally would warrant a new trial unless an adequate and timely cautionary instruction is given.

Defense counsel's delay in voicing her objection is not fatal for its lack of timeliness or immediacy. *See LaPointe*, 525 A.2d at 914–15; *White*, 512 A.2d at 1374; *Taylor*, 425 A.2d at 1235. We find that counsel's trial etiquette, in waiting for the prosecutor to complete his argument, was proper. We shall not punish counsel for her politeness. Her vocal objection was made at the first available opportunity and was sufficiently timely to preserve her objection for appeal.

Similarly, defense counsel's failure to restate her request for a cautionary instruction is not fatal to defendant's appeal. Counsel made and argued her objection to the best of her ability. The trial justice denied her motion to pass the case and only reluctantly took her request for a cautionary instruction under advisement. In these circumstances we see no reason to require counsel to repeat her objection and request for a cautionary instruction in a situation in which it would apparently be futile to do so. *State v. Mead*, 544 A.2d 1146, 1150 (R.I.1988).

However, although the prosecutor's comments were improper and the defendant's objections were properly preserved for appeal, we find that the trial justice's error in not giving a proper cautionary instruction was harmless in light of the defendant's acquittal on the Saunders charge. *Id.* (improper comments are subject to the harmless-error rule). The prosecutor's improper comments were not such that they would have prejudiced the jury's judgment regarding the remaining two charges.

Accordingly, the defendant's appeal is denied and dismissed. The judgments of conviction are affirmed, and the papers of the case are remanded to the Superior Court.