**STATE**

v.

**Matthew FERRARA, et al.**

No. 88–568–C.A.

Supreme Court of Rhode Island.

March 7, 1990.

James E. O'Neil, Atty. Gen., Sheldon Whitehouse, Asst. Atty. Gen., and Annie Goldberg, Sp. Asst. Atty. Gen., for plaintiff.

Richard Casparian, Public Defender, Barbara Hurst, Donna Uhlmann, Asst. Public Defenders, and James P. Renaldo, Hutton & Hickey Law Offices, Ltd., Providence, for defendants.

## OPINION

MURRAY, Justice.

This case is before the court on the appeals of the defendants, Matthew Ferrara (Ferrara) and Steven Thompson (Thompson), from their convictions in Providence County Superior Court. Ferrara appeals from a conviction of one count of first degree sexual assault for which he was sentenced to life imprisonment; two counts of kidnaping, two counts of robbery, and one count of assault with intent to murder for which he was sentenced to twenty years for each count, the kidnaping counts to run concurrently and the others to run consecutive to the life sentence previously imposed; one count of conspiracy and two counts of assault with a dangerous weapon for which he received ten years for each count, the conspiracy count and one count of assault with a dangerous weapon to run concurrently and one count of assault with a dangerous weapon to run consecutive to the life sentence previously imposed; and breaking and entering for which he was sentenced to five years to run consecutive to the life sentence previously imposed.

Thompson appeals from a conviction of one count of robbery for which he was sentenced to life imprisonment; one count of conspiracy, one count of breaking and entering, and two counts of assault with a dangerous weapon for which he was sentenced to ten years for each count, each to run concurrently with the life sentence except the sentence for breaking and entering, which is to run consecutive to the life sentence previously imposed; two counts of kidnaping, one count of robbery, one count of assault with intent to commit murder, and one count of assault with intent to commit rape for which he was sentenced to twenty years for each count, each to run concurrently.

Ferrara alleges that the trial justice erred in failing to give a cautionary instruction to the jury to disregard an alleged implication created by a witness that defendant had a previous criminal record. Ferrara asserts that the trial justice erred in denying his motion to sever, thereby allowing him and Thompson to be tried together. Further, Ferrara asserts, the identification evidence obtained from the photo array shown to the victims was so suggestive that its submission to the jury violated his right to due process of law. Both Ferrara and Thompson allege that the trial justice erred in granting a mistrial instead of dismissing the indictment upon the prosecutor's failure to submit discoverable information because his second trial violated his right to be free from double jeopardy. Thompson alleges that the trial justice erred in denying his motion for judgment of acquittal. Accordingly, we advert to a brief precis of the factual situation in order to discuss each issue in depth.

On the evening of January 20, 1987, Shelly Souza (Souza) was parked in her car with her boyfriend, Dean Deantonio (Deantonio), in Roger Williams Park when Ferrara and Thompson walked up to the car window and asked Souza for a cigarette. When Souza told them that she did not have one, they opened her car door and put a knife to her throat. Ferrara and Thompson got into the car, and Deantonio was made to sit in the back seat with Thompson. Souza remained in the front seat with Ferrara, who sat behind the wheel. Ferrara and Thompson ordered Souza and Deantonio to give them their jewelry including two gold chains, one a short chain with a Playboy bunny's head and one with an aphrodisian head on it, and one pair of diamond earrings. Deantonio was then ordered to bend over and cover his head with a jacket.

Ferrara drove off and onto Interstate 95 South. While holding a knife to Souza's neck, he ordered her to take off all her clothes and to perform fellatio. Thompson stated from the back seat that he wanted her to do him next. Ferrara then pulled

over to the side of the road on I–95 South to allow everyone to switch seats. At this point Deantonio got away and ran. Ferrara, Thompson, and Souza got back into the car, with Thompson behind the wheel and Ferrara and Souza in the back seat, and continued on I–95 South.

After he escaped, Deantonio flagged down two cars. One car was driven by Mr. and Mrs. Nobles and the other car was driven by Roy Urban (Urban), who was accompanied by his friend Dwayne Cote (Cote). Deantonio got into Mr. and Mrs. Nobles' car, and they began to chase Ferrara and Thompson. Urban and Cote followed the Nobles' car in the chase. Thompson and Ferrara noticed that they were being followed. Mrs. Nobles testified that through the back-seat window she could see the outline of a man holding a very large knife to the neck of a naked woman. Ferrara then opened the door and pushed Souza from the car while traveling in the high-speed lane going approximately sixty miles per hour. Deantonio and the Nobles stopped to pick up Souza and then continued to chase Thompson and Ferrara.

Urban testified that when he saw Souza thrown from the car, he pulled in front of Thompson and Ferrara and locked his brakes. The two cars collided, and Thompson and Ferrara's car skidded off the road. Urban stopped seventy yards away, but by the time he ran to Thompson and Ferrara's car, they had gone. Neither Urban nor Cote saw what defendants looked like while they were chasing them.

A Rhode Island State Trooper testified that in his search for defendants, he found footprints around the home of Edward O'Brien (O'Brien). He eventually found defendants lying face down under a car in O'Brien's garage.

A lieutenant with Rhode Island State Police testified that while taking an inventory of Ferrara's personal effects, he found diamond earrings, a chain and medallion, and two gold chains in the pockets of Ferrara's jacket. He did not find any weapons in his search of either Thompson or Ferrara. A detective lieutenant with the Rhode Island State Police testified that the knife used by defendants was never recovered in the police search of the area.

Ferrara and Thompson were indicted on eleven counts stemming from the January 20, 1987 incident. The state tried both defendants together. The case originally opened on December 7, 1987. The jury was sworn in on December 12, 1987. On the second day of trial the case was passed when a state's witness, Edward Nobles, revealed for the first time while on the stand that he was now able to identify Thompson after he had been unable to make a prior out-of-court identification.

On January 20, 1988, the case was heard again, and the trial justice denied defendants' motions to dismiss and to sever. A second jury was impaneled and sworn in, and the trial was held on January 25, 26, 28, 29, and February 1, 1988. At the conclusion of the state's case defendants moved for judgment of acquittal. The trial justice reserved his decision. The jury returned guilty verdicts on all counts for both Thompson and Ferrara. On February 9, 1988, the trial justice denied defendants' motions for a new trial and for judgment of acquittal. On March 22, 1988, defendants were sentenced. Ferrara filed a notice of appeal on March 31, 1988, and Thompson filed a notice of appeal on April 5, 1988.

Ferrara contends that the trial justice erred by failing to give a cautionary instruction when the state's witness testified on crossexamination that a photo of Ferrara had been taken two years earlier. Ferrara asserts that this statement implied to the jury that he had been in trouble before.

The record before us indicates that Souza and Deantonio identified Thompson and Ferrara from a photo array that contained two pictures of Ferrara. One picture was taken on January 20, 1987, and the other picture was taken in November of 1985. At the time of this identification, Lieutenant Johnson (Lt. Johnson) of the Rhode Island State Police did not know that the photopack contained two pictures of Ferrara.

During cross-examination of Lt. Johnson by Ferrara's attorney, the following testimony was elicited before the jury:

"Q  Now, I take it, that as just testified the idea here is that Dean is suppose to look through these photographs, which are going to—contained a number of different individuals, don't they?

"A  Yes.

"Q  In this particular photographic displays—displays one, two, three, four, five, six, seven pictures of different male individuals?

"A  That is correct.

"Q  Now, did you have personally know any of the people that are contained in these particular photographs?

"A  I didn't personally know anyone, no, other than the defendants, themselves.

"Q  And do you know if the Defendant's picture appears in this photographic display?

"A  Yes, I do.

"Q  Would you please point out to me his picture of the defendant?

"A  (Witness so Indicating).

"Q  Are there any other?

"A  Yes, there are.

"Q  Another picture of the defendant in the photo—

"A  Yes.

"Q  Which would be that?

"A  This one.  (Indicating).

"Q  So, Lieutenant, you are telling us that in this photographic display, there are two pictures of the same person?

"A  That is correct.

"Q  But you just testified that you are trying to get a photographic display of entirely different individuals, aren't you?

"A  Yes, I was.

"Q  But, that is not the case in this photographic display, is it?

"A  In this photographic display, there was a photograph picked out, placed in the group from two years earlier that had been taken of Mr. Ferrara.

"Q  And placed in the same photographic display as another photograph of Mr. Ferrara?

"A  Yes.

"Q  And that would be contained in number 4C?

"A  4C, one taken on the 20th of January of 1987."

Thereafter, at a side-bar discussion, Ferrara's attorney moved to pass the case on the basis of Lt. Johnson's response, alleging that it was nonresponsive and prejudicial.  Alternatively Ferrara's attorney moved to strike part of the answer and requested that a cautionary instruction be given.  The trial justice found that defendant "opened the door" by asking Lt. Johnson the question on cross-examination.  He further stated that "[t]he prosecutor could have that—bring to the attention of the jury the fact that maybe this photographic line-up was unfair.  Then she would have the right to go back *on redirect* and ask Lt. Johnson some questions.  You opened the door."  (Emphasis added.)  After further discussion with the attorneys at side bar, the trial justice ruled as follows:

"I am not going to pass it.  I don't know what I will do with it.  I won't pass it.  I might give a cautionary instruction *at the time*.  I am not going to do it now.  I think it will call attention to it.  I am aware of it.  I am not—just not going to do anything, at this point.

"[Ferrara's counsel]: Okay."  (Emphasis added.)

We have held that "when counsel goes fishing on cross-examination, he cannot assume that in playing with fire, he will not get burned."  *State v. Edwards*, 478 A.2d 972, 975 (R.I.1984).  It is clear from the transcript that it was Ferrara, and not the state, that introduced the evidence that Ferrara had been in trouble two years earlier through defense counsel's line of questioning during Lt. Johnson's cross-examination.  Ferrara may not have intended Lt. Johnson to make such a statement.  However, Ferrara's questions to Lt. Johnson on cross-examination were broadly worded.  As a result Lt. Johnson's statement was responsive to the questions asked.

Furthermore, our review of the record indicates that Ferrara's counsel failed to renew his request for cautionary

instructions subsequent to the trial justice's ruling. We have held that "to preserve this issue on appeal, the defendant at trial must have made a request for appropriate instructions. * * * We shall dispense with this requirement, however, whenever a request for instructions would have been futile * * *." *State v. Anil*, 417 A.2d 1367, 1373 (R.I.1980); *see State v. Pugliese*, 117 R.I. 21, 25, 362 A.2d 124, 126 (1976).

This case is distinguishable from *State v. Turner*, 561 A.2d 869 (R.I.1989). In *Turner* we decided that

"defense counsel's failure to restate her request for a cautionary instruction is not fatal to defendant's appeal. Counsel made and argued her objection to the best of her ability. The trial justice denied her motion to pass the case and only reluctantly took her request for a cautionary instruction under advisement. In these circumstances we see no reason to require counsel to repeat her objection and request for a cautionary instruction in a situation in which it would apparently be futile to do so." *Id.* at 874.

Although Ferrara's counsel requested cautionary instructions following Lt. Johnson's testimony, the trial justice's statements during the subsequent side-bar discussion as well as his ruling indicated his willingness to hear a request for a cautionary instruction only "at the time" of the prosecution's redirect examination of Lt. Johnson. Ferrara's counsel agreed by stating, "Okay," after the trial justice's ruling. Since the trial justice indicated that he would consider a cautionary instruction "at the time" of redirect examination, a subsequent request would not have been futile or an idle gesture. In fact the trial justice proposed a time at which to make the request. Ferrara's counsel failed to object and request cautionary instructions, perhaps strategically, at redirect examination and again at the jury charge. Therefore, when defense counsel failed to restate his request for a cautionary instruction at trial, he waived his right to appeal this issue.

■ Ferrara next argues that the trial justice abused his discretion by denying

Ferrara's motion to sever. Ferrara asserts that Thompson presented an antagonistic defense because Thompson's trial strategy was to blame Ferrara for the crimes and to present himself as an innocent bystander.

We have held that "a criminal defendant is not entitled to severance as a matter of right; a motion for severance is directed to the discretion of the trial justice." *State v. Parente*, 460 A.2d 430, 437 (R.I.1983). The defendant must show affirmatively that he in fact suffered "prejudice sufficiently substantial to impinge upon his right to a fair trial." *State v. Patriarca*, 112 R.I. 14, 28, 308 A.2d 300, 310 (1973); *see also State v. Gibbons*, 418 A.2d 830, 835 (R.I.1980).

This court has found that the "antagonistic defenses of codefendants may warrant severance 'if the conflict * * * is real and substantial and of such an irreconcilable nature that it is likely the jury will infer guilt on the basis of the conflict alone.' " *State v. Tarvis*, 465 A.2d 164, 172 (R.I. 1983) (quoting *State v. Clarke*, 448 A.2d 1208, 1209 (R.I.1982)).

Ferrara relies on *State v. Clarke*, 448 A.2d 1208, 1209 (R.I.1982), in asserting that his right to a fair trial was denied because his codefendant Thompson presented antagonistic defenses. In *Clarke* three defendants were tried jointly for murder. At trial, defendant Clarke exercised his constitutional right not to testify. One of Clarke's codefendants testified that he was not involved in the murder but identified Clarke as the murderer. We found that such testimony was antagonistic because it was intended to exculpate the codefendant while directly inculpating Clarke.

In contrast, this case does not involve the presentation of evidence that tended to inculpate one defendant while exculpating the other. *State v. Eddy*, 519 A.2d 1137, 1140 (R.I.1987). Neither Ferrara nor Thompson testified; thus, neither defendant testified against the other. Both victims testified that defendants acted in concert. Souza testified that both defendants forced their way into her car while Ferrara held a knife to her throat. She further testified that she was forced to perform fellatio on Ferrara while Thompson was in

the back seat guarding Deantonio. Also she testified that Thompson was driving the car when Ferrara pushed her from it. Deantonio testified to the same events.

Our review of the record indicates that there was no antagonism that would deny Ferrara a fair trial. This is not a case wherein evidence presented against one defendant necessarily "rubbed off" on the other. Thompson was charged with a count of conspiracy, under which the acts of his coconspirator are chargeable to him. Also the jury was instructed that an aider and abettor may be considered a principal offender if he was acting in concert with the principal. Therefore, evidence presented by Thompson tending to implicate Ferrara would also implicate Thompson. In fact it would be against Thompson's penal interest in presenting such evidence.

Furthermore the trial justice properly instructed the jury that "just because one person might be guilty of something, does not mean necessarily that the other person is guilty of something, does not mean necessarily that the other person is guilty of that crime. That is strictly within your province as the triers of the facts."

The defendant has failed to demonstrate that the denial of his motion to sever by the trial justice resulted in denial to him of a fair trial. Upon the record we find no abuse of discretion by the trial justice.

■ Ferrara argues that the photo array was so unnecessarily suggestive as to raise a substantial likelihood of irreparable misidentification and that the introduction of this evidence violated his right to due process of law. Ferrara asserts that the photo array contained two photographs of him. He also asserts that one of the pictures displayed blood running down his face and on his lips. Ferrara alleges that Souza and Deantonio identified him in the photograph because it depicted him as bloody and beaten up. He contends that this photograph was highly distinctive and that it therefore triggered the identification.

Ferrara's pretrial motion to suppress the photographic identification was denied by the trial justice. After the trial justice's examination of the photographs, he found that the photographs were not impermissibly suggestive. In fact he stated that it was "an excellent photographic lineup." Further, the trial justice found that the identification by the victims resulted from an independent source and not from looking at the photographs. Both victims had opportunity to observe what Ferrara looked like. The dome light of the car went on as Ferrara and Thompson entered the car on the night of January 20, 1987.

In *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the United States Supreme Court established a two-step test in determining whether an out-of-court identification is admissible. The first step is to determine whether the photographic array was suggestive. If the photographic array is determined to be suggestive, then the second step is to look at the totality of the circumstances surrounding the identification to determine its reliability and, therefore, its admissibility.

We now turn to the first step of the *Manson* test, namely, whether the photographic array was suggestive. We have held that the fact that a photo array contains two photographs of a suspect does not alone make the identification suggestive. *State v. Pulphus*, 465 A.2d 153 (R.I. 1983). In *Pulphus* the defendant's appearance in each photograph was "sufficiently dissimilar." The two photographs were taken three years apart, and the defendant's appearance was significantly different in each photograph. One photo showed the defendant with large sunglasses and an Afro-type hair style, and the other showed her without sunglasses and with straight hair.

Based upon our own independent examination of the photo array, our finding is that the photographs were not suggestive. The two photographs of Ferrara are also sufficiently dissimilar. The photographs were taken two years apart. In the 1985 photograph Ferrara's hair was short, he had a beard, his skin appeared dark, and he had a small nose. In the 1987 photograph Ferrara's hair was long and curly, he had no beard, his skin appeared lighter, and his nose appeared larger. Indeed, the photo-

graphs were so different that the police officer who put the array together, Lt. Johnson, and the victims all did not recognize Ferrara as the same person in both pictures.

Furthermore, defendant's assertion that the photograph the victims identified was highly distinctive because it depicted him as bloody and beaten up is without merit. Other courts have held that a distinctive marking or feature is not suggestive when the marking would not draw attention to it. *State v. Bailes*, 118 Ariz. 582, 578 P.2d 1011 (1978); *Smith v. State*, 490 N.E.2d 748 (Ind.1986).

In *Bailes* the defendant's photograph showed him with two black eyes and a broken nose. The court found that the array was not suggestive since there was no evidence that the assailant had facial injuries at the time of the attack. Likewise there is no evidence in the record that Ferrara was beaten up or injured by another means. Also, from our examination of the photograph, we find that it is not readily apparent that there is blood coming down Ferrara's chin. In fact, Deantonio was not always sure the picture showed blood as evidenced by his response to a question by Ferrara's counsel during cross-examination:

"Q Now this photograph is the photograph with a man with some blood coming down from his chin?

"A Whatever it is."

There is no evidence that Souza or Deantonio was influenced by this feature of the photograph at the time of the identification. Each testified that she or he immediately recognized Ferrara.

Although it is not necessary to reach the second step of the *Manson* analysis, an examination of the circumstances of the identification indicates its reliability. First, both Souza and Deantonio had an excellent opportunity to view Ferrara during the crime. Souza saw Ferrara through her car window. When Ferrara opened the car door, the dome light illuminated the inside of the car for several minutes, making Ferrara's facial features even more apparent to the victims. Deantonio also had oppor-

tunity to view Ferrara while they sat inside the car. Deantonio testified that he was in the front seat with Ferrara and Souza (in the middle) prior to being forced into the back seat. Second, upon viewing the photographs, both Souza and Deantonio identified Ferrara without a doubt. Last, the time between seeing Ferrara and the photo identification was only one day. Therefore, the trial justice was correct in finding that the photographs were not suggestive and the out-of-court identification was admissible.

■ Both Ferrara and Thompson argue that the trial justice erred in granting a new trial upon the prosecutor's failure to submit discoverable information because it violated their right to be free from double jeopardy. The defendants assert that the Rhode Island State Police failed to disclose that they had shown photographic arrays to Mr. and Mrs. Nobles, neither of whom had been able to make a positive identification. Thompson argues that the prosecutor's failure to provide discoverable information appeared to be deliberate and thus warranted dismissal of the indictment. Further, they assert that the prosecution intended to provoke a mistrial, and therefore, the double jeopardy clause barred his second trial. The state asserts that there was no prosecutorial misconduct, and therefore, a mistrial was appropriate.

In *Oregon v. Kennedy*, 456 U.S. 667, 676, 102 S.Ct. 2083, 2089, 72 L.Ed.2d 416, 425 (1982), the United States Supreme Court held that "[o]nly where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." We adopted this standard in *State v. Gordon*, 508 A.2d 1339 (R.I.1986), and *State v. Diaz*, 521 A.2d 129 (R.I.1987).

In *Diaz* the defendant argued that this court should adopt a more stringent rule relating to prosecutorial overreaching. In refusing to uphold a stricter rule, we held that the dismissal of an indictment is a drastic remedy. Further, in *Kennedy* the Supreme Court of the United States

reached "a careful balance between the right of a defendant to obtain a completion of his trial by the first tribunal assembled to pass in judgment upon him and the societal interest in apprehending and punishing those who are guilty of serious crimes." *Diaz*, 521 A.2d at 133.

The question of whether prosecutorial misconduct was intended to provoke a defendant into moving for a mistrial is a factual question to be decided by the trial court. *Id.* The trial justice denied defendants' request to dismiss the indictment based on a violation of defendants' rights to be free from double jeopardy. The trial justice found that the state did not intentionally withhold information and that Mr. Nobles' testimony was a "complete surprise" to everyone.

The record indicates that the trial justice was correct in denying defendants' request to dismiss the indictment and in finding that defendants' right to be free from double jeopardy was not violated. Mr. Nobles testified that when he was shown approximately twelve to fourteen photographs by Lt. Johnson about two weeks after the incident, he could not identify anyone positively. Lieutenant Johnson testified that he did not tell the prosecutor that he had shown a photo array to Mr. Nobles. He stated that he did not make a report on the fact that he showed Mr. Nobles the photo array or that Mr. Nobles failed to identify defendants. Lieutenant Johnson explained that since there was a negative response to the array, he did not feel it was relevant to the case. Further, the prosecutor adamantly denied knowing that Mr. Nobles would or could identify either defendant. We find that defendants' motion for a mistrial was not the result of government action intended to provoke a mistrial request. We find no evidence of intentional withholding of information by the state.

█ Furthermore Thompson's assertion that the state failed to comply with Rule 16 of the Superior Court Rules of Criminal Procedure by not supplying a report of what transpired between Lt. Johnson and the prosecutor between the first and second trial is without merit. Rule 16 lists the discovery obligations of the state and the defense. The trial justice may order any appropriate sanction for failure to comply with Rule 16. We find after our review of the record that the trial justice was correct in denying defendants' motion to dismiss on failure to disclose under Rule 16. All information relating to the photo array shown to the Nobles as well as Lt. Johnson's actions concerning the photo array was revealed to defendants before the second trial began. This evidence was elicited when Lt. Johnson took the stand at defendants' hearing on their motion to dismiss the indictment. The defendants extensively cross-examined Lt. Johnson at that time. We find no violation of Rule 16.

Thompson asserts that the trial justice erred in denying his motion for judgment of acquittal. He argues that there was insufficient evidence that he was guilty of the crimes charged. He claims that the state merely proved that he was present during the crime. The state asserts that there was plenty of evidence indicating that Thompson actively participated in the crime.

We have held that in ruling on a motion of judgment of acquittal, the trial justice must determine whether the evidence presented is capable of generating proof of guilt beyond a reasonable doubt. *State v. Girouard*, 561 A.2d 882, 889 (R.I.1989). On review we view the evidence in the light most favorable to the state and draw all reasonable inferences consistent with guilt and may not weigh the evidence or assess the credibility of the witnesses. *Id.*

The defendant relies on *State v. Gazerro*, 420 A.2d 816 (R.I.1980). In reversing the defendant's conviction in *Gazerro*, we found that "the state failed to carry its burden to establish beyond a reasonable doubt that [the defendant] aided in and abetted the commission of the crime." *Id.* at 829. In *Gazerro* we found that the state failed to prove beyond a reasonable doubt that the defendant affirmatively participated in the crime. Conversely we find that in the instant case there was sufficient evidence that Thompson affirmatively participated in the crime. Thompson was not an innocent bystander; he played an active role in the crime.

Thompson and Ferrara both forced their way into Souza's car. Thompson kept watch over Deantonio while Ferrara drove, and Thompson commanded Souza to "do me next." Moreover, after Ferrara pulled the car over on I–95 South, Thompson got out of the car to switch seats with Ferrara so that Ferrara could be in the back seat with Souza. If Thompson was merely an innocent bystander as he asserts, he would have taken this opportunity to flee while the car was stopped rather than driving the car away with Souza in it. As Thompson drove down the highway, he noticed that they were being followed and warned Ferrara. Also while driving, Thompson told Ferrara to "get rid of the bitch," and shortly thereafter Ferrara pushed Souza out of the car. Furthermore, both Ferrara and Thompson fled the car after the car was forced off the road. They were both found together, hiding under a car in a nearby garage. For these reasons we find that the trial justice was correct in denying Thompson's motion for judgment of acquittal.

Upon a review of the issues raised by the defendants on appeal and our analysis thereof, we conclude that in the instant case the issues are without merit. Hence the defendants' appeals are denied and dismissed, and the judgments of the Superior Court are affirmed.