STATE

v.

Monserrate RAMOS.

No. 89-267-C.A.

Supreme Court of Rhode Island.

May 15, 1990.

James E. O'Neil, Atty. Gen., Jeffrey Greer, Asst. Atty. Gen., for plaintiff.

Robert B. Mann, Providence, for defendant.

## OPINION

MURRAY, Justice.

The defendant, Monserrate Ramos, appeals from a Superior Court judgment of conviction of assault with intent to murder. The defendant advances three arguments on appeal. He claims that his pretrial motion to suppress the identification of the defendant by John Washington, a witness, was improperly denied. He also claims that the trial justice impermissibly restricted the cross-examination of Washington. The defendant's final argument is that the state's use of a peremptory challenge to eliminate a juror was unconstitutional in violation of the defendant's Fourteenth and Sixth Amendment rights. We find that the defendant's appeal is without merit and hereby affirm the judgment of conviction.

Although the identity of the gunman is disputed, the facts of this case are uncontroverted. On the evening of April 18, 1987, at about 8 p.m. John Durand drove with Keith St. Louis to Prospect Heights in Pawtucket in order to purchase cocaine. The passenger side of the car, where St. Louis was sitting, was approached by John "Marty" Washington, who offered to sell them cocaine. The three negotiated the terms of the sale and, after sampling some cocaine, Durand and St. Louis agreed to purchase one-sixteenth of an ounce of cocaine for $80. In actuality the substance purchased was baking soda, not cocaine.

Immediately after the transaction was completed, a fourth person ran up to the

passenger window from behind the car. This person held a gun to St. Louis' face and threatened to shoot St. Louis if he did not give the assailant the substance believed to be cocaine. Before St. Louis had an opportunity to respond or react, the assailant shot him in the face. Immediately after the shooting the assailant ran away, and Durand raced St. Louis to the hospital. St. Louis remained at the hospital for two months because of the extensive damage to his face. The bullet destroyed the teeth and gums of the upper right-hand side of his mouth and injured the palate and an eye.

Washington testified as a witness to the incident. He stated that he had been introduced to defendant a couple of months earlier at the house of a drug dealer named African Barry and that he had seen defendant on the street several times thereafter. Washington knew defendant by his nickname, "Mons," and he knew that defendant was from New York. Washington also testified that when he first approached St. Louis in the car on the night of the shooting, he saw defendant standing by the curb approximately thirty feet away. After Washington completed the sale, he walked a few feet away from the car, heard footsteps behind him, and turned to see defendant standing at the passenger window with a gun. Washington testified that he shouted to defendant that the cocaine was not real and not worth stealing. He then heard a gunshot and saw defendant run by saying, "I got him. I got him." Washington claimed that he subsequently ran away in a panic and hid until the police picked him up for questioning at his home later that night.

At the police station Washington identified defendant as the assailant. He gave the police his name, "Mons," and told them where he could be found. The police picked up defendant and asked Washington if he wanted to identify the assailant in a lineup or face to face in a showup identification. Washington insisted on seeing him face to face and upon viewing defendant, Washington immediately identified him as the assailant. A confrontation ensued, and

police officers had to hold Washington to keep him from attacking defendant.

On September 29, 1988, the trial court heard defendant's motion for suppression of Washington's in-court and out-of-court identifications. The defendant asserted that the identifications were tainted by an improperly suggestive one-on-one showup at the police station. The trial justice denied the motion, finding that Washington's prior knowledge of defendant was significant enough that his courtroom identification was not dependent upon a tainted confrontation at the police station.

During the suppression hearing and the trial, defendant's attorney attempted to question Washington regarding charges pending against Washington for an offense he allegedly committed after the date of the assault on St. Louis. After defense counsel disclosed the pending charges and questioned Washington as to whether he expected leniency from the prosecution in exchange for his testimony, the trial justice limited further questioning of Washington.

In addition to Washington two other witnesses testified as to admissions made to them by defendant. Effrain Domenech, defendant's friend, testified that while in his apartment he heard two gunshots on the night in question at about 8 p.m. Shortly thereafter defendant entered the apartment, and stated that he had just shot someone and had thrown the gun in the backyard. Domenech did not tell the police about these events when he was taken to the police station that evening. He instead informed the police of this information two days later.

George Thompson also testified that in conversations with him, defendant had admitted shooting St. Louis. In June 1987 Thompson was incarcerated at the Intake Center with defendant. Thompson stated that on at least three occasions defendant admitted having shot someone in the face.

On October 11, 1988, the jury found defendant guilty of assault with intent to murder. A motion for a new trial was heard and denied on October 25, 1988; and on December 2, 1988, the trial justice sentenced defendant to twenty years imprison-

ment with all twenty years to be served, retroactive to April 17, 1987. The defendant appealed to this court on December 22, 1988.

The defendant objects to the one-on-one confrontation between defendant and Washington. He urges this court to adopt a rule that requires the state to prove that exigent circumstances existed in order to justify the use of a showup as opposed to a lineup. Moreover he argues that no exigencies required that the witness make this type of identification. In the alternative, defendant argues that the showup identification was unreliable in light of the five-factor, totality-of-the-circumstances test set out in *Manson v. Brathwaite,* 432 U.S. 98, 112–15, 97 S.Ct. 2243, 2252–54, 53 L.Ed.2d 140, 153–55 (1977), and *Neil v. Biggers,* 409 U.S. 188, 198–200, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401, 410–11 (1972).

■ Last term this court had an opportunity to consider adopting a new rule regarding the use of showup identifications. In *State v. Turner,* 561 A.2d 869 (R.I.1989), we rejected the defendant's claim that the state should show that exigent circumstances require the use of a showup as opposed to a lineup. We stated that "the main issue before the court is the reliability of the suggestive identification itself, not its relative reliability as compared to a lineup or other less suggestive type of identification." *Id.* at 871. We see no reason to now adopt a stricter rule.

■ Furthermore we hold that the showup identification was reliable when considered in light of the five-factor, totality-of-the-circumstances test. The five factors to be used in determining the reliability of the suggestive identification procedure are:

"[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation." *Id.* (quoting *Biggers,* 409 U.S. at 199–200, 93 S.Ct. at 382, 34 L.Ed.2d at 411).

When we compare the facts of this case to those in *Turner,* where we found that the identifications met the totality-of-the-circumstances test and were properly admitted by the trial justice, we find that in this case Washington's identification of defendant was even more reliable. In this case Washington knew defendant whereas in *Turner* the witnesses had never seen or met the defendant before the crime.

The reliability of Washington's identification of defendant is increased by his close proximity to defendant and the crime and the extended length of time Washington had to view defendant. Besides having had the opportunity to see defendant before the night of the shooting, Washington had an excellent opportunity to view defendant immediately before, during, and after the shooting. By his own admission, Washington perused the area for police and viewed defendant standing on the corner. After completing the transaction, Washington testified that he stood at the back of the car, a short distance from defendant, when he heard footsteps behind him and turned to see defendant at the car window with the gun. He heard defendant say to St. Louis, "Give it up, what you just bought." Washington had an additional opportunity to see defendant after the gun sounded off and defendant ran by him, yelling, "I got him." Washington testified that defendant ran "throwing a piece [gun] in his hands * * * with his sixteenth [of baking soda] in his hand."

Washington's degree of attention was also excellent. He testified that he turned to look directly at defendant when he heard the footsteps behind him. After hearing the gunshot, Washington's attention was again drawn to defendant. His attention was such that he was able to recount exactly what was said, what defendant was holding, and in which direction defendant ran.

Washington also described defendant as the assailant before the showup identification occurred. He told the police that the assailant was "Mons," and he told the police where he could be found. This information proved accurate because defendant,

whose nickname was "Mons," was indeed located at the place Washington indicated.

Addressing the fourth factor, we find that Washington's level of certainty at the confrontation with defendant was remarkable. Washington immediately identified defendant. Moreover, Washington nearly attacked defendant out of anger for having involved him in the shooting. Police officers had to restrain Washington. Washington's certainty—as revealed by his instant identification and his hostile reaction toward defendant—was the only reason that the confrontation was so brief.

The final factor to be considered, the length of time between the crime and the confrontation, also weighs in favor of the showup's reliability. Washington identified defendant within a several-hour period. In fact defendant concedes that the length of time between the time of the crime and the confrontation was "concededly short."

After applying the appropriate test the trial justice held that the showup identification in addition to Washington's in-court identification were independently reliable. We believe that the trial justice's holding is accurate and well supported by the record.

■ The defendant also claims that the trial justice impermissibly restricted the cross-examination of Washington at trial. He claims that his inability to cross-examine Washington adequately about a possible promise of leniency offered to Washington in exchange for his testimony voided defendant's right to cross-examination. *State v. Anthony*, 422 A.2d 921, 925 (R.I. 1980).

We hold that defendant was afforded sufficient opportunity to cross-examine and to reveal any possible bias on the part of Washington. *Id.* at 924. Upon cross-examination of Washington, defendant elicited information about the pending charges. Washington was asked several times whether he had hopes or expectations regarding the disposition of the pending charges against him. He was also asked whether the state had made any promises

to him or any deals. Washington answered these questions repeatedly, claiming that he had no expectations with regard to the robbery charge pending against him. Only after defendant posed the same question to Washington a third time at trial did the court sustain the state's objection to the question. In limiting the repetitive questions of defendant, the trial justice was within her discretion. *State v. DeBarros*, 441 A.2d 549 (R.I.1982). The defendant was granted a sufficient degree of latitude to satisfy the Sixth Amendment right to cross-examination. *State v. Parker*, 566 A.2d 1294, 1295 (R.I.1989).

■ The final issue we address is whether the trial justice erred by allowing an unconstitutional use of a peremptory challenge by the state. According to the case of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), a defendant sets out a prima facie case of racial discrimination in violation of the Fourteenth Amendment if he or she establishes (1) that he or she (the defendant) is a member of a cognizable racial group and (2) that the facts of the case raise an inference that the state used a peremptory challenge to remove a potential juror because he or she was a member of the same racial group as defendant. Once defendant sets out a prima facie case of racial discrimination, the burden shifts to the state to demonstrate a neutral reason for the exclusion of the juror. *Id. See also Commonwealth v. Soares*, 377 Mass. 461, 387 N.E.2d 499 (1979) (a prosecutor can rebut a prima facie case by demonstrating that he or she exercised the peremptory challenge against jurors other than those of a defendant's class).

We believe that a protracted discussion of *Batson v. Kentucky* is not appropriate at this time. Although defendant is Hispanic and therefore a member of a cognizable racial group, the facts of this case do not raise an inference that the prosecutor removed the prospective Hispanic juror [1]

---

1. The prospective juror may not have been Hispanic. His surname could have been Portuguese, but for the sake of discussing this case

under a *Batson* challenge, we shall assume he was Hispanic, that is, the same race as defendant.

because of the juror's race. In this case the juror admitted to having known the defense attorney before the trial. The excluded juror had a friend who had been represented by the defense attorney. The fact that the excluded juror knew the defense attorney prior to the trial as counsel to a friend is a sufficiently neutral reason for excluding him. Even if we assume that defendant set out a prima facie case of racial discrimination, we believe that the state met its burden of proof by advancing a neutral reason for exercising the peremptory challenge against the excluded juror.

We likewise see no Sixth Amendment violation by the state's use of the peremptory challenge against the potentially Hispanic juror. In arriving at this conclusion we are mindful of the fact that the Sixth Amendment guarantees that the selection of the jury will be in an impartial manner. *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). We find, however, that the exclusion of a juror who had prior contact with the defense attorney furthers, not frustrates, the possibility that the final jury will be impartial.

Accordingly the defendant's appeal is denied and dismissed. The judgment appealed from is hereby affirmed.