STATE

v.

Orlando LUCIANO.

No. 96–497–C.A.

Supreme Court of Rhode Island.

Oct. 26, 1999.

Aaron L. Weisman, Providence, for plaintiff.

Janice M. Weisfeld, Paula Rosin, Providence, for defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

WEISBERGER, Chief Justice.

This case comes before us on appeal by the defendant, Orlando Luciano (defendant), from a judgment of conviction entered after a jury trial in the Superior Court on charges of one count of murder, one count of carrying a firearm after having previously been convicted of a crime of violence, and one count of carrying a pistol without a license. The defendant was sentenced to life imprisonment for the murder count and received a ten-year sentence for each gun count to run concurrently with each other but consecutively with the life sentence. From the judgment of conviction the defendant filed a timely appeal. We affirm. The facts of the case insofar as pertinent to this appeal are as follows.

At approximately 6 p.m. on September 5, 1995, Angel Bermudez (Bermudez), Luis Sanchez (Sanchez), Angel Henriquez (Henriquez), Gary Fernandez (Fernandez), and Kris Urena (Urena), were standing at the corner of Broad Street and Sumter Street in Providence, Rhode Island, when a man later identified as defendant approached Bermudez and shot him in the back, killing him. On August 30, 1995, defendant and Bermudez had gotten into an argument. The defendant had accused Bermudez of stealing heroin from him, an act that Bermudez denied. The defendant then threatened to kill Bermudez. On each of the next two days defendant went to Bermudez's apartment and called for Bermudez to come outside, an invitation that Bermudez refused. The defendant did not encounter Bermudez again until the afternoon of September 5, before Bermudez was shot. Bermudez and defendant had a conversation while defendant sat in his car at the corner of Broad and Sumter Streets. The defendant drove away and allegedly returned fifteen minutes later, wearing a hat and a bandanna across his face, and fatally shot Bermudez.

At trial Sanchez testified that he had known defendant for two months prior to September 5, 1995. He stated that he was standing a couple of feet from Bermudez when he was shot. The shooter was wearing a hat and a bandanna that covered a portion of his face. Despite this attempt at disguise, Sanchez immediately recognized the shooter as defendant.

Sanchez was then taken to the Providence police station on September 5. He told the police that he could not identify the shooter. He testified that he was scared and did not want to get involved. He was brought back to the station on September 8, 1995. At that point he told the police that it was defendant who had shot Bermudez. He looked at a photo array of six photographs; he picked out defendant's picture from the photo array as the person who had shot Bermudez. Before he identified defendant, he was not told by the police that they suspected defendant of the shooting.

Henriquez testified that he had known defendant for five years prior to September 5, 1995. He said that he saw defendant four to five times per week during that period. He stated that he was five feet from Bermudez when defendant shot him in the back. He was able to look at the shooter for three seconds and immediately recognized defendant as the shooter. He was so close to the shooting that after the gunfire stopped, he checked himself to see if he himself had been shot.

At the suppression hearing Henriquez testified that he went to the Providence police station on September 8, 1995. There, after he gave a statement identifying defendant as the person who had shot Bermudez, the police showed Henriquez a single picture of defendant. The police asked Henriquez if he knew the person in the picture. Henriquez stated that it was defendant.

At trial Fernandez testified that he had known defendant for three to four years prior to September 5, 1995. During that period he would see defendant once or twice a week. On September 5, Fernandez arrived at the corner of Sumter and

Broad Streets between 5:30 and 6 p.m. He spoke with Bermudez, who told him that defendant had threatened that if he did not give defendant two packs of heroin within two hours, defendant was going to shoot him. A half-hour after this conversation Fernandez saw defendant shoot Bermudez. Fernandez was five feet from Bermudez when he was shot. He was able to look at the shooter for five seconds. He testified that despite the fact that the shooter wore a hat and a bandanna, he immediately recognized that the shooter was defendant. He went to the Providence police station on September 6 and identified defendant as the shooter. The police showed Fernandez a single photograph of defendant and asked whether he recognized the person pictured. He replied that it was defendant.

At trial Urena testified that he had known defendant for two months prior to September 5, 1995, and in that period had seen defendant some thirty-five times. He stated that on September 5, 1995, as he walked toward the corner of Broad and Sumter Streets, he saw defendant in a parking lot behind a restaurant on Broad Street. Urena said that he was four feet from defendant and witnessed defendant tie a bandanna around his face. Urena then walked to the corner of Broad and Sumter Streets. He next saw defendant shoot Bermudez. Urena was standing six feet from Bermudez when the shooting occurred. Urena stated that defendant wore the same bandanna that he was seen putting on moments earlier.

At the suppression hearing Urena testified that on September 6, he went to the Providence police station and identified defendant as the shooter. The police then brought Urena to a room with a one-way mirror. The defendant sat alone in the adjoining room. The police asked Urena if he recognized the person in the adjoining room. Urena told the police that he recognized the person as the one who shot Bermudez. He then gave a written statement to that effect. The police then showed a single photograph of defendant to Urena, which he again identified as defendant.

Anthony Reynolds (Reynolds) also testified for the state. He stated that he was incarcerated at the Adult Correctional Institutions (ACI) at the same time that defendant was awaiting his trial in this matter. He testified that defendant told him that he had shot a person named Angel because he thought that Angel had taken "a couple of browns" from him. According to Reynolds, a "brown" is fifty bags of heroin. The defendant told Reynolds that he gave this person a couple of hours to return his heroin. When he did not, defendant told Reynolds, he went home to get his gun, a baseball hat, and a scarf. The defendant said that he then returned to Sumter Street, walked up to Bermudez, and shot him. Reynolds offered this testimony in the hope of reducing his current prison sentence.

Vilma Ruiz (Ruiz) testified for defendant. She stated that on September 5, 1995, defendant came to her home at about 5 p.m. and left between 8:30 and 9 p.m. She testified that defendant did not leave her apartment during that time. Betz Mary Carmona (Carmona), Ruiz's daughter, also testified for defendant. She lives with her mother and corroborated her mother's testimony that defendant had arrived at her home sometime between 5 and 6 p.m. She testified that defendant left at 9 p.m. According to Carmona, defendant never left the apartment between the time he arrived and the time he left.

After considering the testimony of these witnesses, the jury found defendant guilty of murder, carrying a firearm after having previously been convicted of a crime of violence, and carrying a pistol without a license. The defendant filed a timely notice of appeal to this Court. In support of his appeal defendant raises two issues. These issues will be dealt with in the order in which they were presented in defendant's brief.

## I

## MOTION TO SUPPRESS IDENTIFICATION TESTIMONY

■ The defendant claims that the trial justice erred by denying his motion to suppress Urena's, Fernandez's, Henriquez's, and Sanchez's in- and out-of-court identifications. He argues that their identifications were achieved by means of unnecessarily suggestive police procedures and lacked independent reliability. When reviewing a trial justice's decision on a motion to suppress eyewitness testimony, the reviewing court applies the "clearly erroneous" rule and views the evidence in the light most favorable to the state. *State v. Gatone*, 698 A.2d 230, 235 (R.I. 1997). Viewing the evidence in the light most favorable to the state, we conclude that the trial justice did not err in denying defendant's motion to suppress the in- and out-of-court identifications.

■ To determine the admissibility of an out-of-court identification, we employ a two-step procedure. First, we must consider whether the police procedures used in the identification process were unnecessarily suggestive. Second, if the out-of-court identification was unnecessarily suggestive, we then consider whether in the totality of the circumstances the identification was nonetheless reliable. *See Gatone*, 698 A.2d. at 235–36; *State v. Camirand*, 572 A.2d 290, 293 (R.I.1990).

■ Under the first prong we look to the photographic-identification procedure to determine whether the circumstances give rise to a substantial likelihood of misidentification. *Gatone*, 698 A.2d at 235. We examine the photographic array used by the witnesses and compare the physical characteristics of each individual pictured to the general description of the defendant. A photographic array is not unnecessarily suggestive if the individuals pictured have the same general characteristics as the defendant. *State v. Barnes*, 559 A.2d 136, 140 (R.I.1989). Here Sanchez testified that he was shown a photographic array comprising six photographs. As the trial justice noted, this photographic array depicted men of the same age and similar physical characteristics. From this array Sanchez picked out defendant's picture as the person who had shot Bermudez. The trial justice was not clearly wrong in denying defendant's motion to suppress the photographic array.

■ The use of an individual picture of defendant was not unnecessarily suggestive either. Absent "a very substantial likelihood of irreparable misidentification" the out-of-court identification should be admitted. *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968). In *Camirand* this Court said that the out-of-court identification was "flawed" when the police showed the witness a single picture of the defendant and told her the man pictured might be the person who robbed her. 572 A.2d at 293. Here Henriquez and Fernandez both identified defendant as the shooter before they were shown defendant's picture. The police did not suggest that the man in the photograph was the shooter. Rather they simply showed the picture to confirm their identification. As such, the use of this picture was not unnecessarily suggestive.

■ In regard to Urena's identification that he saw defendant through a one-way mirror as defendant sat alone in another room, this too was not unnecessarily suggestive. Although the United States Supreme Court has noted that the practice of a showup identification has been widely condemned, *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199, 1206 (1967), the "admission of evidence of a showup without more does not violate due process." *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972). Here, at the suppression hearing, Urena testified that the police never indicated that the person behind the mirror was suspected of having shot Ber-

mudez. Urena testified that he told the police that defendant had shot Bermudez, then he identified defendant through the one-way mirror, and then the police showed Urena a single photograph of defendant from which Urena again identified defendant as the shooter. There was no possibility of misidentification here because Urena identified defendant before the showup identification was even attempted and without any prompting by the police.

The procedures used by the police in the instant case were not so unnecessarily suggestive as to give rise to a substantial likelihood that defendant was misidentified. All the witnesses identified defendant as the shooter before the police made any suggestion that they suspected defendant to have been the shooter. Neither the showing of a single photograph nor the showup identification after the witnesses identified defendant was unnecessarily suggestive but was simply a confirmation of an already given identification.[1]

■■■ The trial justice was also correct in denying the motion to suppress under the second prong because the totality of the circumstances show the identifications were independently reliable. Reliability is "the linchpin in determining the admissibility of identification testimony.'" *State v. Vanover*, 721 A.2d 430, 436 (R.I. 1998) (quoting *Manson v. Brathwaite*, 432 U.S. 98, · 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140, 154 (1977)). In *Camirand*, even though the identification procedures used by the police were "flawed," the witness's identification was admissible under this prong because it was independently reliable. 572 A.2d at 293–94. When a determination of the independent reliability of an identification needs to be made,

the factors to be considered are "the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Gatone*, 698 A.2d at 236.

■■■ Here, all four witnesses testified that they were standing no more than five feet from Bermudez when he was shot. Each had an unobstructed view of defendant shooting Bermudez in broad daylight. They each were able to look at the gunman for at least three seconds. They all described the gunman in essentially the same manner. They all immediately recognized defendant as the gunman. They all identified defendant as the shooter to the police within three days of the shooting. Finally, nothing could be more persuasive and reliable than the testimony from Urena, who stated that he saw defendant put a bandanna on his face and then, within minutes, the same man, with the same bandanna, shot Bermudez. Therefore, the out-of-court identification of defendant by these four witnesses cannot be deemed unreliable. The trial justice was therefore correct to deny defendant's motion to suppress the identifications.[2]

## II

### DENIAL OF THE MOTIONS FOR MISTRIAL

The second issue defendant raises on appeal concerns the trial justice's denial of his three motions to pass his case because of alleged prejudicial errors. The defendant argues that his trial was rendered fundamentally unfair when Sanchez testified that defendant had threatened him to

---

1. Even though the trial justice did not specifically determine that the pretrial identification procedures were not unnecessarily suggestive, we believe, on the basis of the above-mentioned reasons, that they were not. Consequently the trial justice could have ended his inquiry with the first prong of the test and not proceeded to the second step.

2. Even if the questions of suggestiveness and reliability would be considered mixed questions of law and fact pursuant to *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), and were reviewed *de novo* by this Court, we would reach the same result.

prevent him from testifying and when Reynolds testified that he had advised defendant that he had a weak case and that defendant was known at the ACI to be a particularly dangerous person.

▪ A motion to pass a case is viewed as a motion for a mistrial. *State v. Parkhurst*, 706 A.2d 412, 427 (R.I.1998). A trial justice's ruling on a motion for a mistrial is entitled to great weight and will not be disturbed on appeal unless the trial justice is clearly wrong. The trial justice "has a front-row seat at the trial" and is in the best position to determine whether a defendant has been unfairly prejudiced. *State v. Gomes*, 690 A.2d 310, 317–18 (R.I. 1997). In considering a motion for a mistrial, the trial justice must determine whether the evidence would cause the jurors to be so inflamed as to make them unable to decide the case on the basis of the evidence presented. *State v. Mastracchio*, 672 A.2d 438, 444 (R.I.1996). Applying these principles to the present case, we do not consider the evidence to be of such a character as to inflame the jurors' passions to the extent of preventing their calm and dispassionate evaluation of the evidence.

Here defendant first moved to pass his case when Sanchez testified that he had to leave the country because defendant had threatened him to prevent him from testifying. The trial justice denied the motion and ruled defendant's attorney had opened the door to this line of questioning. Further, the trial justice gave a cautionary instruction that was prepared by defendant's attorney.

▪ The trial justice was not clearly wrong in denying defendant's motion to pass. The defendant's attorney created the impression on cross-examination that Sanchez had fled the jurisdiction to avoid testifying. He implied that the state had arrested Sanchez's mother in order to ensure Sanchez would testify and inculpate defendant. On redirect examination, the state asked Sanchez why he had left the United States. He replied that he had received threats to discourage him from testifying against defendant. The defendant's attorney clearly opened the door to the state's inquiry into the reasons why Sanchez left the United States.

▪ The defendant next made two motions to pass his case because of statements made by Reynolds. First, Reynolds stated that he was incarcerated with defendant while defendant awaited trial in regard to this matter. The defendant asked Reynolds what Reynolds thought his chances would be to succeed at trial. Reynolds testified that he told defendant that "he didn't have a chance." Second, Reynolds stated that defendant did not have friends while incarcerated at the ACI because he was considered by other inmates to be dangerous. The defendant's attorney moved to pass the case after both statements because he argued that these statements were highly prejudicial. The trial justice denied both motions. He ruled that in respect to the first motion defendant was not prejudiced to the extent that he could not get a fair trial. He felt that because Reynolds was only a lay witness, his opinion on the merits of defendant's case would not influence the jury. In respect to the second motion the trial justice ruled that although the comment was prejudicial, it did not rise to the level of inflaming the jurors' passions against defendant.

▪ Here again the trial justice was not clearly wrong. To warrant a mistrial the evidence must be of such a character as to "inflame the passions of the jurors to the extent of preventing their calm and dispassionate examination of the evidence." *Parkhurst*, 706 A.2d at 427. In the first statement Reynolds gave his opinion that defendant did not have a strong case. The jury was aware of Reynolds's criminal background and the fact that he considers himself to be a jailhouse lawyer, owing to his independent study of the law while spending over twenty years of his life in jail. This, however, does not make him an expert, nor would it be enough to sway the jurors from their own independent appraisal of the evidence.

In the second statement it was the defendant's attorney on cross-examination who asked Reynolds if the defendant was in some way special to him as opposed to other inmates. Reynolds replied that, "[a]ctually, he kind of was, because he stood out from the other Spanish population. He more or less wasn't as warmly welcome into their [cliques] as the majority of them were because he was thought of as a dangerous individual." As this Court has noted, "when counsel goes fishing on cross-examination, he cannot assume that in playing with fire, he will not get burned.'" *State v. Ferrara*, 571 A.2d 16, 19 (R.I.1990) (quoting *State v. Edwards*, 478 A.2d 972, 975 (R.I.1984)). Although Reynolds's answer was unresponsive and unexpected by the defendant's attorney, it does not rise to the level of inflaming the jurors to the point where they could not dispassionately evaluate the evidence. Therefore, the trial justice was correct in denying the defendant's motions for mistrial.

For the reasons stated the defendant's appeal is denied and dismissed. The judgment of conviction is affirmed, and the papers of the case are remanded to the Superior Court.