STATE

v.

Eugene TEXTER.

No. 2006–131–C.A.

Supreme Court of Rhode Island.

June 1, 2007.

Lauren S. Zurier, Providence, for Plaintiff.

Janice M. Weisfeld, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## O P I N I O N

Justice ROBINSON for the Court.

The defendant, Eugene Texter, was charged by information with two counts of second-degree sexual assault, in violation of G.L.1956 § 11–37–4, and one count of simple assault, in violation of G.L.1956 § 11–5–3. Following a hearing that resulted in the denial of the defendant's pretrial motions to suppress (1) the out-of-court and the in-court identification of the defendant and (2) certain tangible evidence seized by the police, a trial was held. At the conclusion of the trial, the jury returned guilty verdicts on all three counts. The defendant was sentenced to a term of fifteen years to serve on count 1, to a consecutive term of fifteen years to serve on count 2, and to a term of one year to serve on count 3, which was to be served consecutively to the term imposed on count 1 but concurrently with the term imposed on count 2.

On appeal, defendant contends that the denial of his motion to suppress the complainant's out-of-court and in-court identifications constituted reversible error because, according to defendant, said identifications were procured by impermissibly suggestive procedures. The defendant also contends that the hearing justice erred in denying his motion to suppress certain tangible evidence seized

by the police after they stopped him since, according to defendant, he did not freely and voluntarily consent to a search.

For the reasons set forth in this opinion, we affirm the judgment of conviction.

### Facts and Travel[1]

On the morning of September 22, 2003, Jill,[2] who was then fourteen years of age, was walking from her home to Narragansett High School, where she was a freshman. As she neared the school, Jill turned from South Pier Road onto an asphalt path that separates the school's soccer field from a patch of nearby woods. Once she was on the path, a man whom Jill later identified as defendant came out of the woods and approached her. When he was approximately six inches away from Jill, he showed her some photographs that had been downloaded from a computer. The photographs depicted three naked girls, and Jill's assailant asked her: "Have you seen these teenage whores?" Although the man was standing behind her while holding the pictures in front of her, Jill turned around and was able to look at the man. She then resumed walking towards the school because she wanted to get away from him.

As Jill walked away from the man, he sprayed her in the eye with some kind of cleaning fluid and then grabbed her. She screamed, and the man put his hand over her mouth and told her: "If you scream, you'll die." The man then pushed Jill into the woods and forced her to the ground, but she fought him by biting and scratching.[3] The man eventually relented, telling her: "Fine. Just go."

---

1. The facts that are summarized in this opinion have been gleaned from the testimony of the multiple witnesses who testified at defendant's pretrial suppression hearing.

2. We shall refer to the victim pseudonymously throughout this opinion in order to protect her privacy.

3. It should be noted that Jill testified at trial that, after her assailant pushed her to the

Jill then resumed walking towards the high school, but she was once again confronted by the man; he had picked up an "I–Zone" camera [4] and, while standing fairly close to her, photographed her with the camera. After taking the picture, the man left and Jill proceeded to go to the school.

Once she arrived at school, Jill spoke to a friend of hers and told her what had happened. Jill also related what had happened to Officer Randall D. Shields of the Narragansett Police Department, who had been summoned to the school.

Officer Shields testified at the pretrial suppression hearing that he spoke to Jill at approximately 7:15 a.m. on the morning of the assault; he stated that she described her assailant as being a white, heavyset male with a gray stubbly beard, who was slightly shorter than Officer Shields. Jill also informed Officer Shields that the man had been wearing a black hooded sweatshirt, which appeared to have something stuffed underneath it.

Officer Shields transmitted Jill's description of her assailant to other Narragansett police officers over his radio. Less than fifteen minutes later, Officer Shields received a radio transmission from another officer informing him that a possible suspect had been detained. Officer Shields then drove with Jill and her mother and aunt (both of whom had arrived at the high school) to the place where the suspect had been detained; that trip took less than five minutes.

Officer Shields testified that, as they were driving, he explained to Jill that they were going to look at a person whom the police had detained and that Jill should indicate to him whether or not that person was her assailant. When they arrived, defendant was standing at the intersection of Route 108 and South Pier Road in Narragansett and was in the company of several police officers.

Detective Kimberly A. Hill also testified at the pretrial suppression hearing. It was she who had detained defendant. She testified that three officers had responded to her request for backup after she detained defendant, but she also specifically testified that the officers were not "swarming around" him. To the contrary, it was her testimony that there were no more than two officers standing next to defendant at any one time. Detective Hill noted that defendant was not handcuffed. She also testified that she was in plain clothes on the morning in question.

As Officer Shields, accompanied by Jill and her mother and aunt, arrived at the place where defendant was detained, he parked his car between twenty and thirty feet away from defendant. He testified that, immediately upon seeing defendant, Jill's "whole demeanor changed" and she "stiffened right up and she looked in the back seat at her mother and aunt." The police officers walked defendant towards Officer Shields' car, and they asked the man to pull up the hood of the sweatshirt he was wearing [5] and then to put on his hat. When Officer Shields asked Jill whether or not the man was the one who had grabbed her near the high school, she responded that she was unsure, and she then turned her head away from defen-

---

ground, he touched her breasts and vaginal area over her clothes.

4. Jill testified that she was able to recognize the camera as being an "I–Zone" brand camera because some of her friends owned I–Zone cameras.

5. As will be discussed *infra*, the police officers had discovered the sweatshirt on top of some items in one of the baskets of defendant's bicycle and had asked him to put it on before Officer Shields arrived at the scene with Jill.

dant. Officer Shields asked Jill to take another look at the man, and he asked her again whether or not she recognized him as her assailant, but she did not respond. Jill testified that, when she was looking at the man, she was scared. Officer Shields then suggested to Jill that they drive around the corner so that she would not have to see defendant anymore, and he proceeded to drive to a bank parking lot approximately one hundred yards away.

Officer Shields testified that, once in the bank parking lot, he told Jill that she could tell him if the man that the police had detained was her assailant; he also told her that, if he was not the correct person, she should tell him that as well. Officer Shields also told Jill that, if the man being detained was the correct man, she did not need to be afraid because he was with the police. When Officer Shields then asked Jill whether she recognized the man as her assailant, she said yes. Jill testified that Officer Shields did not tell her what to say.

While Officer Shields was in the bank parking lot with Jill and her mother and aunt, Officer William F. Reilly, Jr.[6] (one of the officers who had responded to Detective Hill's request for backup) asked defendant for permission to search two bags that were in his bicycle baskets. Officer Reilly testified at the pretrial suppression hearing that defendant, who was calm and very cooperative, responded: "Yeah, go ahead."

Sergeant Michael J. Gama,[7] another of the officers who had responded to Detective Hill's request for backup, searched one of defendant's bicycle baskets upon hearing him give permission for the police to do so. According to Sergeant Gama, one of defendant's bicycle baskets contained a purple nylon, zippered, cooler-type bag. When Sergeant Gama unzipped the bag and looked inside, he found an I–Zone camera, which he believed matched the description of one of the items in the possession of Jill's assailant according to the information that had been provided to him.[8] Sergeant Gama testified that, after he saw the camera, he closed the bag. Shortly thereafter, one of the other officers at the scene handcuffed defendant and carried out a preliminary search of his person; during that search, the officer found two knives and two wallets.

Sergeant Gama testified that defendant was then placed in custody and that he brought the seized items, along with defendant's bicycle and the contents of the baskets, to the Narragansett Police Station. The defendant was also taken to the police station, where he was given a pre-printed "consent to search" form, which he signed.[9] After defendant had executed

---

**6.** Officer Reilly had become a Rhode Island state trooper by the time of the pretrial suppression hearing.

**7.** Sergeant Gama had been promoted to the rank of lieutenant in the Narragansett Police Department by the time he testified at the pretrial suppression hearing.

**8.** Officer Shields testified that, after Jill identified defendant as her assailant, Detective Hill arrived at the bank parking lot in her vehicle. Officer Shields further testified that Detective Hill asked Jill what kind of camera was in her assailant's possession at the time of her encounter with him, and Jill responded that it

was an I–Zone camera. According to Officer Shields, Detective Hill then informed them that the police had found an I–Zone camera in one of the bicycle baskets belonging to the suspect who had been detained.

**9.** The defendant testified on his own behalf at the pretrial suppression hearing, and he did not dispute the fact that he gave Officer Reilly consent to search his bags at the location where he had been detained by Detective Hill or that he later signed a consent to search form. However, as will be discussed *infra*, defendant testified that he gave his consent because he felt he could not refuse.

the consent form, the police searched the bags that had been in his bicycle more thoroughly, and they found some tools, a purple cooler, several pornographic magazines, an I–Zone camera, and internet photographs of nude females.

Detective Carl Reynolds also testified at the pretrial suppression hearing. Detective Reynolds testified that he was responsible for investigating the crime scene and for logging any evidence collected from the crime scene. Detective Reynolds further testified that among the items he retrieved from the crime scene was a four-ounce bottle of Simple Green cleaning solution. In addition, upon returning to the Narragansett Police Station to log the evidence, Detective Reynolds noted that there were two small photographs from an I–Zone camera in one of the two wallets that had been seized from the suspect. One of the photographs appeared to Detective Reynolds to be a picture of the Narragansett High School soccer field, which is adjacent to the crime scene.

The defendant was charged by information with two counts of second-degree sexual assault, in violation of § 11–37–4, and one count of simple assault, in violation of § 11–5–3. The defendant filed motions to suppress Jill's identifications of him as well as the tangible evidence that was seized from him. The hearing on defendant's motions to suppress was held on October 26 and 27, 2005. The hearing justice denied defendant's motions, and a trial commenced on November 1, 2005.

At the conclusion of the trial, defendant was found guilty of all three charges. The defendant filed a motion for a new trial, which was heard and denied on December 2, 2005. On January 20, 2006, defendant was sentenced to a term of fifteen years to serve on count 1, to a consecutive term of fifteen years to serve on count 2, and to a term of one year to serve on count 3 (the simple assault charge), consecutive to the term imposed on count 1 but concurrent with the term imposed on count 2. A timely notice of appeal was filed on defendant's behalf on January 30, 2006.

## Analysis

### I

### The Identifications

■ The defendant's first contention on appeal is that the hearing justice erred in denying his motion to suppress both Jill's out-of-court identification and her in-court identification of him. The defendant argues that the out-of-court identification was the result of impermissibly suggestive procedures that resulted in an irreparably mistaken identification in violation of his due process rights. He further contends that, since the out-of-court identification was irreparably mistaken, the in-court identification should also have been excluded because there was no showing that the in-court identification was not tainted by the out-of-court identification. We disagree with these contentions.

■ This Court adheres to the clearly erroneous standard when it reviews a hearing justice's decision to deny a motion to suppress an identification. *See, e.g., State v. Luciano,* 739 A.2d 222, 226 (R.I. 1999); *State v. Gardiner,* 636 A.2d 710, 716 (R.I.1994). In determining whether or not the denial of a defendant's motion to suppress an identification was clearly erroneous, we assess the available evidence in the light most favorable to the state. *See, e.g., Luciano,* 739 A.2d at 226; *Gardiner,* 636 A.2d at 716.

■ It is well settled in Rhode Island that, when making a determination as to whether an identification procedure has violated a defendant's right to due process of law, a hearing justice must employ a two-step mode of analysis. *See, e.g., Luci-*

*ano,* 739 A.2d at 226; *State v. Mastracchio,* 612 A.2d 698, 704 (R.I.1992). First, the court must consider whether the procedure used in the identification was unnecessarily suggestive. *Luciano,* 739 A.2d at 226; *Mastracchio,* 612 A.2d at 704. If the hearing justice concludes that the procedure was unnecessarily suggestive, he or she must then determine "whether in the totality of the circumstances the identification was nonetheless reliable." *Luciano,* 739 A.2d at 226.

The Rhode Island Supreme Court has declined to create a *per se* rule barring the use at trial of identifications resulting from situations in which a suspect was shown individually to a witness. *See State v. Turner,* 561 A.2d 869, 871 (R.I.1989). We have expressly stated that such a *per se* rule would "often frustrate rather than promote justice in situations wherein an identification is reliable despite its unnecessarily suggestive nature." *Turner,* 561 A.2d at 871.

■ In assessing whether a suggestive identification was independently reliable, this Court considers the following five factors:

> "[1] the opportunity of the witness to observe the criminal during commission of the crime; [2] the level of attention paid by the witness; [3] the accuracy of the witness's description of the criminal; [4] the witness's degree of confidence in the identification at the time of confrontation; and [5] the amount of time elapsed between commission of the crime and the confrontation." *State v. Rodriquez,* 731 A.2d 726, 731 (R.I. 1999).[10]

After hearing testimony and considering the arguments of counsel at the pretrial suppression hearing, the hearing justice determined that the show-up procedure which resulted in the identification of defendant by Jill was not unnecessarily suggestive. In reaching that conclusion, the hearing justice rejected defendant's argument that his being surrounded by four police officers at the time of the identification was itself enough to suggest to Jill that defendant was the person whom the police wanted her to identify. The hearing justice noted that Jill did not immediately identify defendant as her assailant; in describing Jill's reaction in this regard, he stated: "She was at best equivocal."

■ The defendant contends the show-up procedure in the instant case was not only highly suggestive, but also unnecessarily so. Although it is undeniable that show-up identifications have some degree of inherent suggestiveness, in certain circumstances the procedure "may be necessary in order to avoid the mistaken apprehension of the wrong person." *United States v. Watson,* 76 F.3d 4, 6 (1st Cir. 1996) (holding that a show-up conducted immediately after the commission of the offense at issue in that case was not unnecessarily suggestive). Moreover, as this Court has previously indicated, the prosecution is not required to demonstrate that exigent circumstances existed which necessitated the use of a show-up procedure rather than another type of procedure. *See State v. Ramos,* 574 A.2d 1213, 1215 (R.I.1990). We can perceive no error with respect to the hearing justice's conclusion that the show-up procedure that the police used to obtain the out-of-court identification of defendant was not unnecessarily suggestive.

■ Although not required to do so, the hearing justice further concluded that, even if he had found the show-up procedure to be unnecessarily suggestive, the identification was independently reliable.

---

**10.** *See also Neil v. Biggers,* 409 U.S. 188, 199– 200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

The hearing justice carefully examined each of the five factors which were enunciated in *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) and which have been utilized by this Court in such cases as *State v. Brown*, 748 A.2d 244, 246 (R.I.2000) and *Rodriquez*, 731 A.2d at 731. He specifically found that Jill had had an opportunity to view her attacker, was attentive to what was occurring around her, and gave an accurate description of defendant. The hearing justice stated that the fact that only one hour had elapsed between the assaults and the identification was "[c]ritical to [his] determination" that the identification was reliable.[11]

We agree with the hearing justice that, considering the totality of the circumstances, even if the procedure used had been unnecessarily suggestive, the identification was independently reliable. It is our opinion that the hearing justice was correct in denying defendant's motion to suppress the out-of-court identification.[12]

## II

### The Tangible Evidence

#### A

#### The Black Hooded Sweatshirt

■ The defendant next contends that the denial of his motion to suppress the tangible evidence seized by the police after they stopped him constituted reversible error because he did not freely and voluntarily consent to a search. Specifically, defendant argues that, after he was stopped by the police, one of the officers removed a sweatshirt from the basket of his bicycle without asking for or receiving his consent to do so. In addition, defendant argues that the consent that he gave the police to search his bicycle baskets after they removed the sweatshirt was coerced and involuntary.

■ Subject to certain exceptions that are not relevant to this case, objects that are within "the plain view" of an officer may be seized and introduced into evidence. *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); *see also State v. Joseph*, 114 R.I. 596, 604, 337 A.2d 523, 528 (1975). In addition, we have held that the items subject to seizure pursuant to the plain-view exception are not "limited to contraband or instruments of the crime" as long as there is a nexus between the seized item and the criminal behavior. *Joseph*, 114 R.I. at 604, 337 A.2d at 528; *see also Warden v. Hayden*, 387 U.S. 294, 307, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (holding that items of clothing found in a house searched by the police without a warrant were properly seized where they matched the description of the clothing worn by the culprit and where the police could reasonably have

---

11. With respect to the complainant's degree of confidence in her identification of defendant, the hearing justice noted that Jill was not initially certain that defendant had been her attacker. The hearing justice noted, however, that there was evidence that the complainant was a "selective mute" and that her reactions upon seeing defendant—tensing up and changing her demeanor—were understandable reactions.

Selective mutism, sometimes referred to as elective mutism, is a disorder that is generally characterized by persistent lack of speech in certain social situations, even though the person manifests the ability to speak in other situations. *See* http://www.asha.org/public/speech/disorders/Selective-Mutism.htm.

12. Having determined that admission of the out-of-court identification did not constitute a violation of defendant's due process rights, we also conclude that the denial of defendant's motion to suppress the in-court identification was properly denied. *See State v. Gatone*, 698 A.2d 230, 236 (R.I.1997) ("If we find that the out-of-court identification is not impermissibly suggestive, then the in-court identification *is likewise proper.*").

believed that the items seized would aid in the identification of the criminal).

In the instant case, Jill had described her attacker as being a white man wearing a black hooded sweatshirt. Detective Hill testified that she had been given a description of the suspect as being a white male in dark clothing. After Detective Hill detained defendant, who she testified was wearing dark clothing when she stopped him, other police officers arrived at the scene; one of those officers gave the detective further information to the effect that the attacker had been described as wearing a black hooded sweatshirt. Detective Hill further testified that, when she detained defendant, she immediately noticed a dark, heavy piece of clothing made out of jersey material, which was rolled up in the basket of his bicycle. Officer Reilly, who was one of the officers who arrived at the scene after defendant was detained by Detective Hill, testified at the suppression hearing that he saw a black hooded sweatshirt lying on top of one of defendant's bicycle baskets.

The hearing justice noted that it was undisputed that the bicycle basket which contained defendant's black sweatshirt was an open mesh-type container. He further noted that there was "no suggestion that that black sweatshirt was not in plain view." After carefully reviewing the record and considering the evidence in the light most favorable to the state, as we must, *see Luciano*, 739 A.2d at 226, we perceive no error with respect to the hearing justice's findings of fact in this regard. Moreover, since the black hooded sweatshirt was in the plain view of the police and since it matched the complainant's description of what her attacker had been wearing, the police could reasonably have believed that the item would aid in the identification of the criminal, and they

properly seized it. *See Hayden*, 387 U.S. at 307, 87 S.Ct. 1642.

## B

### Other Tangible Evidence

The defendant, who also testified at the suppression hearing, acknowledged that he gave consent to the search of his bicycle baskets after the police removed his sweatshirt from one of the baskets. He argues, however, that he gave that consent involuntarily, as the result of coercion by the police. Specifically, he argues that, once detained, he remained with the police in response to their show of official authority. The defendant further contends that, after watching one of the police officers remove the sweatshirt from his bicycle basket without his permission, his consent to a further search of his bicycle baskets "must be characterized as a mere submission to their show of force." We disagree with that contention.

It is well settled that "a search conducted pursuant to a valid consent is constitutionally permissible." *State v. Hightower*, 661 A.2d 948, 960 (R.I.1995); *see also State v. Casas*, 900 A.2d 1120, 1134 (R.I.2006). A consent to search is sufficient to satisfy the requirements of the Fourth Amendment if it was given voluntarily. *Ohio v. Robinette*, 519 U.S. 33, 40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) ("The Fourth Amendment test for a valid consent to search is that the consent be voluntary * * *."). The state bears the burden of proving, by a preponderance of the evidence, that a defendant has freely and voluntarily given consent to a search. *Casas*, 900 A.2d at 1134; *State v. O'Dell*, 576 A.2d 425, 427 (R.I.1990). The determination of voluntariness *vel non* involves a mixed question of fact and law that impacts a constitutional right, and this Court therefore reviews such determina-

tions *de novo. See State v. Dennis,* 893 A.2d 250, 261 (R.I.2006); *see also State v. Wiggins,* 919 A.2d 987, 989 (R.I.2007). Notwithstanding our *de novo* review of the ultimate determination of voluntariness, we give deference to the findings of historical fact made by a trial justice in the context of making that determination. *See In re Joseph B.,* 822 A.2d 172, 174 (R.I. 2003); *State v. Lombardi,* 727 A.2d 670, 673 (R.I.1999); *State v. Cline,* 122 R.I. 297, 303, 405 A.2d 1192, 1196 (1979) (stating that "findings of fact on motions to suppress will not be overturned unless such findings are clearly erroneous").

At the conclusion of the hearing on the defendant's motion to suppress the tangible evidence seized by the police, the hearing justice addressed the defendant's contention that he had given the police consent to search his bicycle baskets involuntarily, as a result of coercion. The hearing justice noted that the defendant had admitted that no one threatened him or "applied any form of physical stress upon him." The hearing justice also not-

ed that the defendant did not provide the court with any articulable basis in support of his contention that he could not have refused consent. He further noted that the defendant first gave oral consent and then later "followed up by giving written consent." Consequently, the hearing justice rejected the defendant's contention that he had been coerced, and he denied the defendant's motion to suppress the tangible evidence. After independently reviewing the record, we agree with the hearing justice's ruling in this regard.

## Conclusion

For the foregoing reasons, the defendant's appeal is denied and the judgment of conviction is affirmed. The record may be remanded to the Superior Court.