**Supreme Court**

No. 2011-92-C.A.

(P1/09-1896AG)

State                              :

v.                              :

Dana Gallop.                              :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

|  |  |
|---|---|
| State | : |
| v. | : |
| Dana Gallop. | : |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## OPINION

**Justice Flaherty, for the Court.** After a disc jockey's performance at a Providence nightclub concluded, the din of the attendees milling about in the street outside the club was punctuated by the sound of gunfire. The shots killed one man and injured another. The defendant, Dana Gallop, was charged with several crimes arising out of the shooting. A jury eventually convicted him of a number of offenses, and he appealed. Before this Court, the defendant argues that the trial justice erred when he denied a motion to suppress out-of-court and in-court identifications that the defendant argues were unconstitutionally suggestive. He further argues that the trial justice should not have permitted the state to use peremptory challenges that he contends violated the Equal Protection Clause of the United States Constitution. For the reasons set forth in this opinion, we affirm the judgment of conviction.

# I

## Facts and Travel

On the night of December 13, 2008, a disc jockey of some repute with the stage name Kid Capri was performing at Passions, a nightclub in Providence. The audience included many individuals from the Boston, Massachusetts area, such as defendant Dana Gallop and Anthony Parrish, who hailed from different parts of the Dorchester section of Boston. London Hardy, another man from the Boston area, also attended the concert. The concert ended, and the club began to empty around two o'clock in the morning on December 14. After the show, the streets outside the club were teeming with people.

Shamair Barboza, a woman who had grown up in Dorchester, was a close friend of Parrish and knew of Gallop. She testified that neighborhood groups with which the two men associated did not get along. As Barboza stood outside Passions, she saw Parrish and his friends walking towards defendant. Barboza said she saw defendant raise his sweatshirt as Parrish approached him, remove a gun from the waistband of his pants, and fire at Parrish. A medical examiner later determined that a bullet entered the middle of Parrish's back and that the resulting wound caused Parrish's death.

Hardy also attended the Kid Capri show with his girlfriend and several friends. After the show ended, Hardy was standing on the street talking to his girlfriend and her friends as they sat in a stopped car. Hardy later testified that he heard three or four gunshots and then told the women that he had been shot. Once they realized that he was serious, the women assisted him into the car. An officer detailed to the concert checked on Hardy, and paramedics then attended to his injuries. Hardy underwent surgery and recovered. Hardy testified that he did not know who shot him and that he was not acquainted with defendant.

When the shooting occurred, Nakia Green occupied the driver's-side rear seat of the car next to which Hardy was standing. Green later testified that she viewed the shooter for five to ten seconds from a distance of eight or ten feet in a well-lit area. Green said that the shooter was a light-skinned black, Hispanic, or Cape Verdean man, about five feet, nine or five feet, ten inches tall, 170 pounds, with braids and a prominent nose.[1]

Ultimately, a police investigation led to defendant's arrest and to his being charged with several crimes. Specifically, he was charged with (1) murder, (2) assault with a dangerous weapon, (3) commission of a crime of violence while armed, (4) commission of a crime of violence through the use of a firearm, (5) unlicensed possession of a firearm, and (6) possession of a firearm by a person previously convicted of a crime of violence. Prior to trial, the attorney general notified defendant that, if he were convicted, the attorney general would seek an additional sentence under the habitual-offender statute, G.L. 1956 § 12-19-21.

The defendant was convicted of all counts except commission of a crime of violence while armed, which the state had dismissed before trial pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure. The trial justice sentenced defendant to two consecutive life sentences, plus a twenty-year sentence to be served consecutively to the second life sentence. The defendant also received two ten-year sentences to run concurrently with the first life sentence. Finally, pursuant to the habitual-offender statute, the trial justice sentenced defendant to an additional twenty years, to be served after the other sentences and to be served without the possibility of parole. The defendant filed a timely notice of appeal. We will provide additional facts where necessary to expatiate upon the issues before us.

---

[1] At trial, the parties stipulated that around the time of the shooting, defendant was six feet tall and weighed 210 pounds.

## II

## Identifications

The defendant argues that the admission of a witness identification was impermissible because the photographic array displayed to the witness was unduly suggestive and because the witness did not have an independently reliable recollection of observing the shooter.

After the shooting, Providence police began an investigation that first led Det. Daniel O'Connell to Rhode Island Hospital, where paramedics had brought London Hardy and Anthony Parrish. Although Barboza and some other friends of Parrish were present at the hospital at that time, none of them provided the detective with a statement. At the Providence police station, however, Hardy's acquaintance Green gave a statement to Det. Michael Fallon.

On December 22, Green agreed to view a photographic array. After traveling to Boston, O'Connell provided Green with a form containing photo-lineup instructions, which both she and O'Connell signed.[2] The form instructed a potential eyewitness that the "group of photos <u>may or may not</u>" include a photo of the suspect. Additionally, it informed its reader that "photographs may not always depict the true complexion of a person. It may be lighter or darker than shown in the photo."

Later, at a suppression hearing, both Green and O'Connell described the process by which Green made her selection. O'Connell said that he arranged six photographs in two rows of three and then had Green approach the table on which the photos had been displayed. Green said that she used a "process of elimination" to make her ultimate selection. She said that she eliminated the photos of two "darker-skinned people" first. Green then removed the photos

---

[2] The Superior Court file arrived in this Court without the photo array that Green viewed. The file was remanded to locate the missing exhibit. When the exhibit was not located, the parties filed copies of the photographs pursuant to Article I, Rule 10(e) of the Supreme Court Rules of Appellate Procedure.

depicting men whose jawlines did not resemble the shooter. Between the two remaining photos, Green chose a single photo, the back of which she and O'Connell signed.[3] The photo that Green selected depicted defendant. O'Connell testified that, during the photo-array procedure, Green did not exhibit any uncertainty and made her selection in approximately thirty seconds.[4]

After selecting one of the six photographs in the array, Green walked the detectives to their car. As O'Connell was inserting the photo pack into a file that had been in the police car, the file opened up to a Boston police department booking sheet for defendant. The booking sheet included both a front-view and, notably, a profile photograph of defendant. Green previously had not seen the document, but when she viewed it, she said, "That's him right there. Why didn't you show me that picture? That's a much better picture." Green elaborated during the hearing on the motion to suppress, explaining that it was a better photo because of the inclusion of a profile photo and because of the fact that it was "not as white-washed."

The hearing also included testimony about the photo array shown to Barboza. On December 16, 2009, O'Connell had an opportunity to speak to Barboza. Barboza had not spoken to police at the hospital on the night of the shooting the prior December, but O'Connell testified that, when he spoke to her in December 2009, Barboza offered remarkable detail of the shooting. She also agreed to view a photo array.

---

[3] Green's and O'Connell's accounts differ regarding how many photos she initially eliminated. According to O'Connell's suppression-hearing testimony, Green rejected three photos initially and then another before finally identifying one photo between the remaining two.

[4] During the suppression hearing, Green testified that, at that time, she did not recognize the shooter in the photographs but that she recalled the photograph that she had previously selected. She also identified defendant as the shooter, although she said that "[she] couldn't be 90 percent. [She] couldn't be sure." The only differences she noted were that defendant was heavier and had a different hairstyle. Green also identified defendant at trial, again noting his hair and weight as the only differences.

O'Connell gave Barboza the same photo-lineup instruction form and showed her a photographic array. From the photographs that Barboza viewed, she selected one depicting defendant. According to O'Connell, she chose that photo "without hesitation."

Following the suppression hearing, the trial justice determined that the photo arrays shown to Green and Barboza were "exceedingly fair" and that they were "about as fair an example of photo-spreads as [he had] seen in a long, long time." Although he concluded that the photo arrays were not unnecessarily suggestive, the trial justice also considered whether the witnesses had "independent recollections of the evening in question." Specifically, the trial justice observed that Green said that she had been only ten feet away from the shooter and that she had a clear, well-illuminated view. He also stated that Green had methodically chosen defendant's photograph with confidence. For Barboza, the trial justice was persuaded that she had an independent recollection because she had known defendant for years and because the shooter's face was clearly visible to her at the time in question.

Moreover, the trial justice was satisfied that the exposure of defendant's booking sheet to Green had been accidental. Green's identification was, according to the trial justice, confident and without hesitation, so the trial justice determined that Green's chance viewing of the booking sheet was "of no moment."

The trial justice denied the motion to suppress, permitted testimony about the witnesses' out-of-court identifications, and allowed the witnesses to make in-court identifications. The defendant argues on appeal that the trial justice erred when he denied the motion to suppress Green's out-of-court and in-court identifications of defendant.[5]

_____

[5] Gallop does not challenge the admissibility of the out-of-court identification by Shamair Barboza, although he says that he disputes the reliability of that identification.

**Standard of Review**

This Court reviews motions to suppress eyewitness identifications under a clearly erroneous standard. State v. Patel, 949 A.2d 401, 410 (R.I. 2008). In making this determination, "we assess the available evidence in the light most favorable to the state." Id. (quoting State v. Texter, 923 A.2d 568, 573 (R.I. 2007)).

**B**

**Discussion**

The evaluation of the propriety of an identification procedure requires a two-step analysis. State v. Brown, 42 A.3d 1239, 1242 (R.I. 2012) (citing Texter, 923 A.2d at 573-74). First, the trial justice must determine "whether the procedure used in the identification was unnecessarily suggestive." Id. (quoting Texter, 923 A.2d at 574). We have more precisely delineated the bounds of acceptable suggestiveness by saying that an identification procedure must have been "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" to be inadmissible. State v. Gatone, 698 A.2d 230, 235 (R.I. 1997) (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)).

If, and only if, the photographic array was unnecessarily suggestive is the second step of the analysis implicated. See Brown, 42 A.3d at 1242. Then, the trial justice must "determin[e] 'whether in the totality of the circumstances the identification was nonetheless reliable.'" Id. at 1242-43 (quoting Texter, 923 A.2d at 574). The factors to be considered in making this determination are

> "[T]he opportunity of the witness to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of the witness'[s] prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the

length of time between the crime and the confrontation." Patel, 949 A.2d at 411 (quoting State v. Parker, 472 A.2d 1206, 1209 (R.I. 1984)).

If the trial justice concludes that the identification has independent reliability, then it will be admissible notwithstanding the suggestiveness of the procedure employed. See id. at 410, 412; State v. Imbruglia, 913 A.2d 1022, 1030 (R.I. 2007).

For the first step of the analysis, the assessment of a photographic array requires us to "compare the physical characteristics of each individual featured in the display to the general description of the suspect given to the police by the [witness]." Brown, 42 A.3d at 1243 (quoting Gatone, 698 A.2d at 235). "[T]he images constituting a photographic array need not be 'look-alikes,' but rather need only possess similar general characteristics." Imbruglia, 913 A.2d at 1029 (citing Gatone, 698 A.2d at 236).

In this case, defendant contends that the men shown in the photographs in the array did not match the description of the suspect given by Green. Specifically, he argues that none of the photographs depicts an individual with a large nose and only three of the photographs show men who could be described as light-skinned black, Hispanic, or Cape Verdean. We disagree; the photographs in the array portrayed men who "possess[ed] similar general characteristics" to the suspect described by Green. See Imbruglia, 913 A.2d at 1029.

In Gatone, 698 A.2d at 236, we "independently examined" the photographic array and the testimony about its presentation to the witness, and we held that the individuals depicted were the same race described by the witness, "appear[ed] to be similar in age," and "possess[ed] similar physical characteristics." Similarly, we affirmed the denial of a motion to suppress an identification in a case in which the witness described the suspect as "dark-skinned" and "black" and the array included a number of photographs that fit that description. Brown, 42 A.3d at

1243-44; see also Imbruglia, 913 A.2d at 1029-30 (upholding the denial of a motion to suppress based on the array containing photos of six white men of similar ages with similar facial hair). Here, we conclude that the individuals depicted in the photographs all have hairstyles, skin tone, and facial features that are sufficiently similar so that they did not create a likelihood of misidentification.

The instructions that police provided to Green before she reviewed the photographs further persuade us that the photographic array did not create "a very substantial likelihood of irreparable misidentification." See Gatone, 698 A.2d at 235 (quoting Simmons, 390 U.S. at 384). Green was informed that "photographs may not always depict the true complexion of a person" and that the "group of photos may or may not" include a picture of the perpetrator of the crime. Those instructions mitigated the risk that Green would choose a photo without realizing that there may have been some level of distortion in the subjects' complexions or that she might choose a photo simply because she believed she was expected to do so. See Imbruglia, 913 A.2d at 1029-30 (affirming the denial of a motion to suppress after the trial justice relied, in part, on the "disclaimer document" shown to the witness).

We do not agree with defendant's argument that the manner in which the array was displayed to Green makes it unconstitutionally suggestive. The defendant contends that the simultaneous rather than sequential display of the photographs renders the array unconstitutional. As we noted when we considered a show-up identification and determined that it had been constitutional, "[i]t is important to note that in these situations the main issue before the court is the reliability of the suggestive identification itself, not its relative reliability as compared to a lineup or other less suggestive type of identification." State v. Turner, 561 A.2d 869, 871 (R.I. 1989) (citing Neil v. Biggers, 409 U.S. 188, 199-200 & n.6 (1972)). The procedure employed

here also must be evaluated on its own merit and not in comparison with a proposed or theoretical procedure. Even in State v. Henderson, 27 A.3d 872, 901 (N.J. 2011), on which Gallop heavily relies and in which the New Jersey Supreme Court considered hundreds of scientific studies on memory and eyewitness identification, the court concluded that the science regarding simultaneous versus sequential procedures was inconclusive.

The defendant also maintains that O'Connell's awareness of the identity of the suspect made his administration of the display of the photographs impermissibly suggestive. O'Connell testified that he laid out the photographs while Green was across the room and then had her approach and view them, so we cannot say that his administration of the array created a substantial likelihood of misidentification.[6]

We hold that the lineup procedure employed in this case was not unnecessarily suggestive. Accordingly, we need not engage in the second step of the analysis, requiring a determination of whether the witness's independent recollection might permit the admission of her identification even if it had followed an impermissibly suggestive procedure.[7]

---

[6] Gallop also emphasizes the recommendations contained in the final report of the Rhode Island Task Force to Identify & Recommend Policies & Procedures to Improve the Accuracy of Eyewitness Identifications, which was created pursuant to G.L. 1956 § 12-1-16. One particular recommendation that defendant cites is the suggestion that the administrator of a photographic array be unaware of the identity of the suspect or conduct the array in a way that prevents the administrator from knowing the position of the suspect's photograph in the arrangement. First, we note that the final report was issued on December 27, 2010, after the witnesses in this case had made their identifications, the trial justice had denied the motion to suppress, and the jury had convicted defendant. Additionally, while we of course see the benefit of using "best practices" in the administration of photographic arrays, we cannot say that the failure to do so necessarily renders an identification procedure constitutionally deficient. See State v. Turner, 561 A.2d 869, 871 (R.I. 1989) (explaining the need to evaluate each procedure individually and not relatively).

[7] The defendant also argues that the display of Gallop's booking sheet to Green confirmed her selection. Although witnesses testified about this incident during the suppression hearing, defendant did not contend in the Superior Court that this "confirmatory feedback" rendered either Green's selection from the photographic array or later in-court identification of defendant

- 10 -

III

**Batson Challenges**

During the jury empanelment, the state used peremptory challenges to two African-American prospective jurors. The defendant contends that the trial justice erred when he allowed the state to strike these two jurors.[8]

The first, juror number 148, worked as a part-time legal secretary for a Providence law firm. Although the juror worked for a lawyer who practiced family law, the office's other attorney is a prominent criminal-defense attorney. The juror also had earned a criminal-justice degree.

The state used one of its peremptory challenges to excise this juror from the panel. The trial justice asked whether there was an objection, and defense counsel responded that he had not "heard anything to disqualify her based on her answers." The trial justice responded by noting that the juror was an African-American woman who "certainly fit[] into the Batson category," and he asked for the state's race-neutral reason to challenge her. The prosecutor said that her degree in criminal justice could cause other jurors to "rely on her expertise in an inappropriate

---

inadmissible. Additionally, the trial justice found that the display of defendant's booking sheet was accidental, which is supported by the record. In our opinion, the accidental display of defendant's booking sheet did not make Green's identifications inadmissible. Cf. State v. Gatone, 698 A.2d 230, 237 (R.I. 1997) ("It is well settled that an accidental encounter between a witness and a defendant that is not contrived by the police or the prosecution will not mandate suppression of the witness's subsequent in-court identification.").

[8] Before either juror had been challenged, a different minority juror was excused for cause. At that time, the trial justice informed the parties,

> "I want the record to reflect that this man was an African-American, maybe Liberian—I'm not sure, but certainly a person of color. There are a couple others on the jury as well. If any lawyer intends to excuse, [or] challenge, any minority [member] of this jury, I want to know about it ahead of time in case there's an objection from the other side. That includes the defense intention to challenge, because the [s]tate can object to that just as much as the defense can object to the [s]tate's challenge."

way." As an additional reason, the state said that the juror's work as a legal secretary in a law firm that includes a criminal-defense attorney made her "inherently defense-oriented." Defense counsel offered no further objection to the prosecutor's proffered reasons. The trial justice considered whether the state offered a "credible, rational reason" and determined that it had. He thus allowed the challenge.

The second juror at issue, number 100, was among the first jurors seated in the jury box. It appears from the record that, when her name was initially called, the juror's response of "here" was not heard by the sheriff, who repeated the judge's instruction to respond. During voir dire, juror number 100 informed the court that she was unemployed and that she had last worked ten years earlier. When asked how she supported herself, the juror responded that she "live[d] at home with [her] family. Mother and brother."

Juror 100 also was challenged by the state. The prosecutor offered her reasons: the juror had been inattentive and had been unemployed for a significant period of time. The defendant objected but without any elaboration whatsoever. The trial justice said

> "I'm satisfied that this is a clearly [race] neutral reason, and I'm satisfied that it is a rational one, reasonable one. And I credit the excuse offered by the [s]tate and do not find it to be a violation of Batson."

As he had with regard to juror number 148, the trial justice excused juror number 100.

Before this Court, Gallop contends that each of these jurors was struck from the panel on the basis of her race, violating Batson v. Kentucky, 476 U.S. 79 (1986). Therefore, defendant argues, he was denied equal protection of the law under the United States Constitution.

- 12 -

## A

## Standard of Review

Because of the nature of the inquiry in a <u>Batson</u> analysis, a trial justice's decision is "accorded great deference." <u>State v. Pona</u>, 66 A.3d 454, 472 (R.I. 2013) (<u>Pona II</u>) (quoting <u>State v. Price</u>, 706 A.2d 929, 935 (R.I. 1998)). Thus, the "ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." <u>Id.</u> (quoting <u>Snyder v. Louisiana</u>, 552 U.S. 472, 477 (2008)).

## B

## Discussion

"The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution 'guarantees the defendant that the [s]tate will not exclude members of his [or her] race from the jury venire on account of race[.]'" <u>Pona II</u>, 66 A.3d at 472 (quoting <u>State v. Pona</u>, 926 A.2d 592, 601 (R.I. 2007) (<u>Pona I</u>)). The United States Supreme Court has "delineated a tripartite test for determining whether a criminal defendant has been denied equal protection of the laws by the state's use of a peremptory challenge." <u>Pona I</u>, 926 A.2d at 601 (citing <u>Batson</u>, 476 U.S. at 96-98).

First, a defendant is required to "establish a <u>prima facie</u> case of purposeful discrimination[.]" <u>Pona II</u>, 66 A.3d at 472 (quoting <u>Pona I</u>, 926 A.2d at 601). This step of the analysis will become moot if the trial justice moves beyond it to consider the second and third steps. <u>See State v. Austin</u>, 642 A.2d 673, 678 (R.I. 1994) (citing <u>Hernandez v. New York</u>, 500 U.S. 352, 359 (1991) (plurality opinion) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question

- 13 -

of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.")).

The second step of a <u>Batson</u> analysis requires "the prosecution to articulate its race-neutral reason(s) for challenging that particular juror." <u>Pona II</u>, 66 A.3d at 472 (quoting <u>Price</u>, 706 A.2d at 935). The reason offered "need not rise to the level justifying exercise of a challenge for cause." <u>Pona I</u>, 926 A.2d at 602 (quoting <u>Batson</u>, 476 U.S. at 97). During the second step, "the issue is the facial validity of the prosecutor's explanation." <u>Id.</u> (quoting <u>Hernandez</u>, 500 U.S. at 360).

The third step of the <u>Batson</u> test requires the trial justice "to determine whether the defendant has carried his or her burden of proving purposeful discrimination." <u>Pona II</u>, 66 A.3d at 472 (quoting <u>Price</u>, 706 A.2d at 935). This determination is the "decisive question": "whether counsel's race-neutral explanation for a peremptory challenge should be believed." <u>Id.</u> (quoting <u>Price</u>, 706 A.2d at 935). "[T]he best evidence often will be the demeanor of the attorney who exercises the challenge." <u>Id.</u> (quoting <u>Price</u>, 706 A.2d at 935).

Here, defendant contends that the state's challenges of jurors number 148 and 100 violated <u>Batson</u>. Because the trial justice considered the race-neutral reasons and ultimately ruled on the challenges, the question of whether defendant established a <u>prima</u> <u>facie</u> case is moot. <u>See</u> <u>Pona II</u>, 66 A.3d at 473 (citing <u>Pona I</u>, 926 A.2d at 607). Gallop argues, however, that the prosecutor's reasons for exercising those challenges were pretextual and hid the true motivation: the prospective jurors' race.

Regarding juror number 148, we have little difficulty concluding that the trial justice's decision that the challenges were exercised for race-neutral reasons was not clearly erroneous. An attorney's genuine belief that a juror's experience might cause him or her to favor the

opposing party would certainly qualify as race neutral.[9]  Nothing raised by defendant at trial or apparent from the record leads us to conclude that the reason was pretextual.  See Pona II, 66 A.3d at 473 ("The prosecutor's reason was not facially implausible or unpersuasive so as to compel a finding that it was pretextual." (citing Austin, 642 A.2d at 678)).

The defendant points to juror number 148's assurances that neither her criminal-justice degree nor her employment in the same office as a criminal-defense attorney would compromise her ability to follow the trial justice's instructions or be an impartial juror.  A juror's ability to be impartial despite experience that might suggest otherwise is an appropriate concern when contemplating excusing the juror for cause.  As we said above, however, a peremptory challenge may be based on a reason that does not rise to the level of a challenge for cause.  See Hernandez, 500 U.S. at 362-63 ("While the reason offered by the prosecutor for a peremptory strike need not rise to the level of a challenge for cause, * * * the fact that it corresponds to a valid for-cause challenge will demonstrate its race-neutral character.").  We are therefore of the firm opinion that the challenge to juror number 148 was not unconstitutional.

The defendant attacks the excusal of juror number 100 by contending that her alleged inattentiveness is not supported by the record and that other, nonminority jurors also were not employed at the time of voir dire but that they were not challenged.  Gallop also contends that unemployment is not a race-neutral reason at all because minorities are more likely to be unemployed.  Neither of these arguments, however, was made to the trial justice at the time he was considering the propriety of the peremptory challenge.  Rather, the prosecutor said that she would be challenging the juror and immediately offered her race-neutral reasons.  Defense counsel, when prompted, said merely, "I object to that, Your Honor."

---

[9] Indeed, defendant subsequently used a peremptory challenge to excuse a prospective juror who had previous law-enforcement experience.

In <u>Pona I</u>, 926 A.2d at 610, we recognized that comparative juror analysis has "practical utility * * * at uncovering pretext," but we nonetheless declined to consider such an argument that was made for the first time on appeal. "[T]he ultimate burden of persuasion regarding the racial motivation rests with, and never shifts from, the opponent of the [peremptory] strike." <u>Id.</u> at 608-09 n.15 (quoting <u>Purkett v. Elem</u>, 514 U.S. 765, 768 (1995)). Gallop failed to meet this burden because he offered only a general objection to the state's reasons and he offered nothing as to how the juror had been attentive or how the proffered reasons were equally applicable to nonminority jurors and therefore pretextual. Accordingly, we have no difficulty in holding that the challenge to juror number 100 did not violate the Equal Protection Clause.

**IV**

**Conclusion**

For the foregoing reasons, the judgment of conviction is affirmed. The papers shall be remanded to the Superior Court.



# RHODE ISLAND SUPREME COURT CLERK'S OFFICE

## *Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**　　　State v. Dana Gallop.

**CASE NO:**　　　No. 2011-92-C.A.
　　　　　　　　　　(P1/09-1896AG)

**COURT:**　　　Supreme Court

**DATE OPINION FILED:**　May 2, 2014

**JUSTICES:**　　　Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**　　　Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**　　Providence County Superior Court

**JUDGE FROM LOWER COURT**:

　　　　　　　　　Associate Justice Robert D. Krause

**ATTORNEYS ON APPEAL:**

　　　　　　　　　For State:  Lauren S. Zurier
　　　　　　　　　　　　Department of Attorney General

　　　　　　　　　For Defendant:  Janice M. Weisfeld
　　　　　　　　　　　　Office of the Public Defender