**Supreme Court**

No. 2013-77-C.A.

(P2/11-160-A)

State                    :

    v.                   :

Robert Austin.           :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                 :

v.              :

Robert Austin.         :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Indeglia, for the Court.** Robert Austin (Austin or defendant) appeals from a Superior Court judgment of conviction after a jury verdict finding him guilty of one count of second-degree sexual assault. On April 2, 2015, this case came before the Supreme Court for oral argument, sitting at Rhode Island College in the City of Providence, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be decided without further briefing and argument. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

Sometime around 1 p.m. on November 29, 2010, the complaining witness, Laura (complainant or Laura),[1] boarded the Rhode Island Public Transit Authority (RIPTA) Route 60 bus in Kennedy Plaza in Providence. Identified as number 0545, the bus was to head south along Route 114, passing through Barrington on its way to Newport. Laura selected a driver's side

---

[1] We refer to the complaining witness in this case by a pseudonym. We do so in order to protect her privacy.

window seat toward the back of the bus. A man carrying a black duffel bag sat down in the seat next to her and unsuccessfully attempted to start a conversation.

As the bus approached the white church in Barrington,[2] the man put his hand between Laura's legs and grabbed her vaginal area over her clothes. Despite Laura's attempts to push his hand away and her order to "stop," the man continued to grab her in the same area. When she turned to look at the man, she observed that he was emotionless. After failing to receive help from fellow passengers, Laura informed the man that the bus was approaching her stop and that she needed to get off the bus. The man turned away from her, moved his duffel bag out of the way, and permitted her to reach the aisle. After her complaint was ignored by the bus driver, she sat down in the front aisle-facing seat. She observed the man ducking behind the back of a seat in order to avoid detection, and she made notes recording the details of the incident, including the bus and route number, as well as the time of day and a description of the man. Soon afterward, at another Barrington stop, the man got off the bus from the front door, hiding his face behind his jacket as he passed Laura, who was still seated.

Laura got off at a stop in Bristol, where she went directly to the Bristol police station to report the incident. Once there, the Bristol police drove her to the Barrington police station, where she spoke with Detective Benjamin Ferreira (Det. Ferreira). Laura described her assailant as a white male over six feet tall and weighing approximately 230 pounds. She noted that he was clean shaven, had short grayish-brown hair, carried a black duffel bag, and wore a gray sweatsuit

---

[2] Commonly known as "the white church," the Barrington Congregational Church is a Rhode Island landmark that sits at 461 County Road.

as well as a purple and yellow sports jacket.[3]  Finally, she stated that her assailant was somewhere between the ages of thirty and fifty.

After Laura left the station, Det. Ferreira sent out a department-wide BOLO[4] with a description of the assailant.  As a result, on November 30, 2010, Patrolman Mark Haddigan detained a man wearing a purple and yellow Minnesota Vikings jacket on Maple Avenue in Barrington.  That man, whom we will refer to only as "McGill," was informed of the sexual assault involving Laura the previous day and voluntarily accompanied officers back to the police station, where he produced a RIPTA bus pass and agreed to be photographed.  He was released shortly thereafter.

On December 1, 2010, while sitting in a park-and-ride adjacent to the white church, Patrolman Michael Gregorezek (Ptlm. Gregorezek) observed another man fitting Laura's general description waiting for a RIPTA bus.  The man, identified as Robert Austin, was wearing a gray sweatsuit and a purple and yellow Vikings jacket; he was also carrying a black duffel bag.  When asked if he was willing to go to the station and answer questions, Austin cooperated.  At the station, Det. Ferreira asked Austin whether he had traveled through Barrington on a RIPTA bus on November 29, 2010, to which he replied that he had not.  Austin admitted that he had boarded a bus that day, but that the bus he was on was headed to Warwick.  He further informed the police that he was the only person in possession of his bus pass.  When the officers asked for his bus pass, he complied and was allowed to leave the station.

---

[3] Although she did not know which team was represented on the assailant's jacket, complainant stated that she saw the letters "V" and "N" in the name.  After initial speculation that this was the logo for the New York Knicks, Det. Ferreira concluded that complainant was likely describing the logo for the Minnesota Vikings of the National Football League, whose team colors are purple and yellow.

[4] A BOLO notice alerts officers to "be on the lookout."  State v. Pitts, 960 A.2d 240, 242 n.4 (R.I. 2008).

Detective Ferreira then transferred the serial numbers from the bus passes of Austin and McGill to RIPTA Assistant General Manager, James Dean (Dean). As Dean explained to the jury at trial, a scan of the serial numbers revealed no activity on McGill's pass on November 29. A scan of Austin's pass, however, showed that it was used twice on that date during the relevant time period, once at 12:59 p.m. to board a Route 30 bus to Warwick, and again at 1:06 p.m. to board a Route 60 bus to Newport.[5] The number of the bus running Route 60 at that time was 0545, matching the number recorded in Laura's notes.

Later on December 1, 2010, Det. Ferreira telephoned Laura and arranged for her to view a photo array at the Bristol police station. The array consisted of seven photographs, which she was shown in sequential order after reading and initialing the Barrington police department procedure on how to view a photo array. The instructions noted that the array "may or may not contain a picture of the person who committed the crime." Photograph No. 1 was of McGill, photograph No. 3 was of Austin, and the remaining five photographs were taken from the Adult Correctional Institutions WINFACTS computer database.[6] Detective Ferreira compiled the list by entering genetic search parameters including gender, age, and weight. He did not include photographs of any bald or mustached men, nor any non-Caucasian men. Both McGill and Austin were fifty-one years old as of the date of the photographs, and the remaining men in the array were aged thirty through forty-two years old.

Laura went through all seven photographs at the station, explaining later at trial that she did not "want to send an innocent person to jail." On completion, she asked to again view

---

[5] The swiping of one card on different buses headed in different directions within a seven minute span can be explained by the "pass-back" system. At trial, Dean described the "pass-back" system as one passenger swiping his card and either passing the card back to someone behind him or finding a way to get the card to someone outside the bus.

[6] Mistakenly referred to in the transcript as WINFAX, WINFACTS is the inmate database for the Adult Correctional Institutions.

photographs No. 1 and No. 3 and to be shown side-view photographs of these two men.  After viewing the side-view photographs of McGill and Austin, Laura immediately identified No. 3, Austin, as "the person who assaulted her on the RIPTA bus."  Confident in her selection, she later testified that the side-view profile photograph of Austin brought his chin and fuller face into focus, and that "[r]ight away [she] knew which one it was."  Detective Ferreira then showed her a photograph of the black duffel bag, which she identified as the bag belonging to her attacker. Detective Ferreira also showed her a photograph of Austin, face concealed, wearing a Vikings jacket and holding a black duffel bag.  Laura identified the jacket and duffel bag as the articles worn and carried by her assailant, respectively.  Finally, Det. Ferreira showed her a photograph of Austin wearing gray sweatpants and a Vikings jacket.  Upon viewing this photograph, Laura stated that she was "one hundred percent certain" that this was the individual who assaulted her.

On January 27, 2011, criminal information P2/11-160A charged Austin with one count of second-degree sexual assault in violation of G.L. 1956 §§ 11-37-4 and 11-37-5.  Before trial, defendant filed a motion to suppress Laura's out-of-court identification, and hearings were held on the issue on June 28, 2012 and July 2, 2012.  At the hearings,[7] defendant contended that Laura's out-of-court identification should be suppressed because of the dissimilarities between the men in the photo array, the questionable accuracy of the complaining witness, and, ultimately, because the photograph identification procedure was unduly suggestive and created a substantial risk of misidentification.

In response, the state contended that the Barrington police appropriately handled the identification procedure.  The state noted that the instructions included the admonition that the perpetrator may or may not be in the array, and that nearly all of the men in the photo array were

---

[7] Both Det. Ferreira and complainant testified at the hearing on the motion to suppress.

of similar builds, weight, and skin tone. Finally, the state commented that Laura had "four chances" to view her assailant, and that she was "a hundred percent certain" that it was defendant. After reviewing the five-factor test for assessing the propriety of an eyewitness identification,[8] the trial justice concluded that the identification procedure was not unduly suggestive, and denied defendant's motion to suppress.

Austin's trial commenced on July 2, 2012; Laura, Det. Ferreria, Ptlm. Gregorezek, and Dean testified. On July 5, 2012, defendant moved for judgment of acquittal, which was denied by the trial justice.

On July 6, 2012, after the close of evidence, the trial justice gave his charge to the jury, which included the following instruction:

> "The burden is on the State to prove beyond a reasonable doubt not only that the crime was committed but that the Defendant was the person who committed the crime. While this concept may seem rather fundamental you may consider one or more of the following as you determine whether the State has proven the identity of the Defendant as the person who committed the crime alleged in the complaint.
>
> "(One) The witness's opportunity to observe the criminal acts and the person committing them, including the length of the encounter, the distance between the various parties, the lighting conditions at the time, the witness's state of mind at the time of the offense, and other circumstances affecting the witness's opportunity to observe the person committing the offense that you deem relevant.
>
> "(Two) Any subsequent identification, failure to identify or misidentification by the witness. Also the certainty or lack of certainty expressed by the witness at the time of the identification,

---

[8] The five factors for assessing an eyewitness identification are: the opportunity to observe; the degree of attention given to those observations; the accuracy of the prior description of the perpetrator; the level of certainty demonstrated by the witness at the identification procedure; and the time between the crime and confrontation. State v. Austin, 731 A.2d 678, 682 (R.I. 1999) (citing Manson v. Brathwaite, 432 U.S. 98, 114 (1977)). We note that there is no known connection between the Austin in the above-cited case and the Austin in the present case.

the state of mind of the witness at the time of the subsequent procedure, the length of time that elapsed between the crime and the subsequent identification and any other circumstances bearing on the reliability of the witness's identification that you as the jury deem relevant.

"(Three) Any other direct or circumstantial evidence which may identify the person who committed the offense charged which corroborates or fails to corroborate the identification by the witness.

"You as the jury must be satisfied beyond a reasonable doubt of the accuracy of the identification of the Defendant before you convict him. If the circumstances of the identification of the Defendant are not convincing beyond a reasonable doubt then you must find the Defendant not guilty."

After the trial justice delivered the complete jury charge, defendant objected to the trial justice's failure to read from either of the two proposed instructions he had previously submitted. One set of proposed instructions was based on instructions submitted pursuant to State v. Henderson, 27 A.3d 872 (N.J. 2011), while the other set was taken from this Court's decision in State v. Figuereo, 31 A.3d 1283, 1290-91 (R.I. 2011). The thrust of defendant's argument was that the trial justice's instruction did not include language concerning "accuracy versus certainty." In response, the state noted that this issue has come up more often in the context of a defendant's proffered eyewitness expert testimony, but that this Court has consistently rejected these experts on the ground that "trustworthiness of eyewitnesses is not beyond the ken of the jurors." Siding with the state, the trial justice declined to give defendant's requested instructions and maintained that the instructions given to the jury in the present case adequately covered the law concerning identification. On July 6, 2012, the jury returned a verdict of guilty on one count of sexual assault.

On July 13, 2012, defendant filed a motion for a new trial. At the hearing on September 24, 2012, he argued that the evidence should have yielded a verdict of not guilty because Laura

- 7 -

could not have fully formed a reliable identification of her assailant, as evidenced by her broad age range estimate. He pointed out the fact that Laura "demonstrated a level of uncertainty" upon her first viewing of the photo array, and that the procedure became overly suggestive and "sloppy" when she was only shown a photograph of Austin in the jacket with the bag. The defendant argued that these issues produced a high likelihood of misidentification such that a reasonable juror could have found in favor of Austin. In response, the state noted that Laura identified Austin as her assailant before she was shown the full-length photograph of Austin wearing the purple and yellow jacket. In denying the motion, the trial justice expressed satisfaction with the identification procedure and found complainant to have testified credibly. Further, he indicated that, if this had been a bench trial, he, too, would have found defendant guilty.

On November 13, 2012, defendant was sentenced to fifteen years, ten to serve, and five years suspended, with probation. Thereafter, on November 27, 2012, defendant filed a notice of appeal of his conviction. A final judgment of conviction and commitment entered on December 17, 2012.[9]

## II

### Issues on Appeal

The defendant raises three issues on appeal. First, he argues that the trial justice erred in denying his motion to suppress Laura's out-of-court identification because of the dissimilarity in the appearances of the subjects in the photo array and because the photographs of defendant were unnecessarily suggestive. Second, he asserts that the trial justice's denial of his motion for a new

---

[9] A premature notice of appeal is "timely so long as a final judgment is entered thereafter." State v. Mercurio, 89 A.3d 813, 817 n.2 (R.I. 2014) (citing State v. Mitchell, 80 A.3d 19, 27 n.6 (R.I. 2013)).

trial was in error. Lastly, he contends that the trial justice erred in denying his request for a specific set of jury instructions. We will address each of these issues in turn.

## III

## Discussion

## A

## Motion to Suppress

"This Court reviews motions to suppress eyewitness identifications under a clearly erroneous standard." State v. Gallop, 89 A.3d 795, 801 (R.I. 2014) (citing State v. Patel, 949 A.2d 401, 410 (R.I. 2008)). "In making this determination, 'we assess the available evidence in the light most favorable to the state.'" Id. (quoting Patel, 949 A.2d at 410).

In evaluating the propriety of an eyewitness identification, the trial justice is to undertake a two-step analysis. See Gallop, 89 A.3d at 801. The first step is for the trial justice to determine "whether the procedure used in the identification was unnecessarily suggestive." State v. Brown, 42 A.3d 1239, 1242 (R.I. 2012) (quoting State v. Texter, 923 A.2d 568, 574 (R.I. 2007)). To be inadmissible, "an identification procedure must have been 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification' * * *." Gallop, 89 A.3d at 801 (quoting State v. Gatone, 698 A.2d 230, 235 (R.I. 1997)). Second, if the identification procedure was unnecessarily suggestive, "the trial justice must 'determin[e] whether in the totality of the circumstances the identification was nonetheless reliable.'" Id. (quoting Brown, 42 A.3d at 1242-43).

The defendant advances two arguments before this Court regarding the alleged suggestiveness of the identification procedure. First, he contends that the composition of the photo array was unfair and that the trial justice was clearly wrong in finding that the physical

characteristics of the men in the array were similar to Laura's description. This, for defendant, was evidenced by the fact that the photographs of the five younger men were immediately ruled out by Laura and, of the two remaining photographs, only Austin matched the weight of the described perpetrator.

We disagree with defendant's assertion. The seven photographs in the array depicted men fitting all of the general characteristics described by Laura. All seven photographs revealed white men between their thirties and fifties, with short hair, and no facial hair. Also, while not all of the men matched defendant's exact weight of 230 pounds, five of the six other men weighed close to 230 pounds. As we have cautioned, "the images constituting a photographic array need not be 'look-alikes,' but rather need only possess similar general characteristics." State v. Imbruglia, 913 A.2d 1022, 1029 (R.I. 2007) (citing Gatone, 698 A.2d at 236). Given that the images in the photo array shared nearly all the same general characteristics, as described by complainant, we are satisfied that the array was not unnecessarily suggestive.

The instructions provided by Det. Ferreira prior to the viewing of the photo array further persuade us that there was no likelihood of misidentification. See Gallop, 89 A.3d at 802. Notably, Laura was informed that the photo array "may or may not contain a picture of the person who committed the crime." That instruction "mitigated the risk" that she would select a photograph "simply because she believed she was expected to do so." Id. (citing Imbruglia, 913 A.2d at 1029-30).

Next, defendant argues that the display of Austin's photographs after Laura's initial selection constituted "impermissibly suggestive confirmation." Specifically, he argues that the trial justice was in error in relying on Laura's level of certainty because that certainty was influenced by Det. Ferreira's confirmatory actions. Those suggested confirmatory actions

- 10 -

included showing Laura a photograph of Austin in the purple and yellow jacket. This claim of error fails, however, because it is clear from the transcript that this photograph was shown to Laura only <u>after</u> she had already identified defendant as her assailant, and there is no indication that Det. Ferreira gave positive feedback at any point in the process.

Having held that the photo array was not unnecessarily suggestive, we need not engage in step two of the analysis, the determination of whether the identification was nonetheless independently reliable. <u>See</u> <u>Gallop</u>, 89 A.3d at 803; <u>see</u> <u>also</u> <u>Brown</u>, 42 A.3d at 1242-43 (holding that, if the identification procedure was unnecessarily suggestive, the trial justice must "determin[e] 'whether in the totality of the circumstances the identification was nonetheless reliable.'" quoting <u>Texter</u>, 923 A.2d at 574). However, even if we had found the identification procedure to have been unnecessarily suggestive, it is readily apparent that the identification was independently reliable. As the trial justice recounted, Laura had a number of opportunities to view her assailant. She looked at defendant when he sat next to her on the bus, when she was fending off his sexual advances, when she maneuvered past him on the way to the front of the bus, when she looked back at him from the front aisle-facing seat, and when he passed her while exiting the bus. Regarding certainty, Laura stated at the photo array that she did not want to send an innocent man to jail, and soon after she said she was certain that defendant was her assailant. Additionally, the mere forty-eight hour lapse between the assault and the identification further weighs in favor of a finding that the identification was independently reliable. Therefore, we find no error in the trial justice's denial of defendant's motion to suppress.

## B

## Motion for a New Trial

It is well established that, on a motion for a new trial challenging the weight of the evidence, the trial justice acts "as a thirteenth juror, exercising independent judgment on the credibility of witnesses and on the weight of the evidence."[10] State v. Fleck, 81 A.3d 1129, 1133 (R.I. 2014) (quoting State v. Heredia, 10 A.3d 443, 446 (R.I. 2010)). In so doing, "the trial justice must consider the evidence in light of the jury charge * * * [and] ultimately determine whether he or she would have reached a result different from that reached by the jury." State v. Watkins, 92 A.3d 172, 191 (R.I. 2014) (quoting State v. Clay, 79 A.3d 832, 841-42 (R.I. 2013)). "If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial should be denied." Id. (quoting Clay, 79 A.3d at 842).

Because a trial justice "is in an especially good position to evaluate the facts and to judge the credibility of witnesses, on appeal, this Court's review is deferential." Watkins, 92 A.3d at 191 (quoting Clay, 79 A.3d at 842). "If the trial justice has articulated adequate grounds for denying the motion, his or her decision is entitled to great weight and will not be overturned by this Court unless he or she has overlooked or misconceived material evidence or was otherwise clearly wrong." Id. (quoting Clay, 79 A.3d at 842).

---

[10] In his decision, the trial justice initially indicated that his intention was to treat the motion as a challenge to the sufficiency of the evidence. He subsequently stated, however, that he was basing at least a portion of his decision on the credibility of complainant's testimony, which is not to be done under a sufficiency of the evidence challenge. See State v. Fleck, 81 A.3d 1129, 1133 (R.I. 2014) (explaining that, on a new trial motion based upon the sufficiency of the evidence, "the trial justice does not weigh the evidence or the credibility of the witnesses"). Despite the apparent conflation of differing standards, the trial justice's analysis centered on a challenge to the weight of the evidence, and we will treat it as such.

Here, defendant argues that the trial justice erred in denying the motion for a new trial because the only reasonable response to the evidence presented was that the identification was incorrect. He avers that the trial justice failed to consider all relevant evidence, including the impact of the photograph of Austin wearing the Vikings jacket, as well as the fact that Laura might not have gotten a proper look at her assailant as he sat next to her given that she was mainly focused on removing his hands from her lap. He also disputes the probative value of the testimony regarding the RIPTA pass, contending that it is just as likely Austin was on a Warwick-bound bus.

As laid out in Fleck, 81 A.3d at 1134, the trial justice considered the evidence in light of the charge to the jury, highlighted by complainant's testimony. He then assessed the credibility of the witnesses and the weight of the evidence, declaring that he found complainant to have testified credibly in light of the fact that she was subjected to a comprehensive cross-examination. The trial justice also expressed satisfaction with the credibility of the testimony that Laura was shown photographs of defendant's jacket and duffel bag only after she had identified defendant as the perpetrator. Further, he noted that the data contained in the bus pass weighed heavily in the state's favor. Finally, the trial justice stated that, if the matter had been a bench trial, he would have also found defendant guilty.

"This Court is loath to overturn the credibility findings of a trial justice because 'it is the trial justice who has the opportunity to observe the witnesses as they testify and therefore is in a better position to weigh the evidence and to pass upon the credibility of the witnesses than is this [C]ourt.'" State v. Richardson, 47 A.3d 305, 318 (R.I. 2012) (quoting Penhallow v. Penhallow, 725 A.2d 896, 897 (R.I. 1998) (mem.)). It is evident that, here, the trial justice followed the proper procedure for assessing a challenge to the weight of the evidence. Additionally, there is

- 13 -

no indication that he overlooked or misconceived material evidence. As such, the trial justice's denial of the motion for a new trial was not clearly wrong, and we decline to disturb that decision.

## C

### Request for Jury Instructions

This Court reviews a trial justice's jury instructions de novo. See Imbruglia, 913 A.2d at 1031. In so doing, we "must examine the instructions in their entirety in order to determine the manner in which a jury of ordinarily intelligent lay persons would have understood the instructions as a whole." State v. Gomes, 604 A.2d 1249, 1256 (R.I. 1992) (citing State v. Lamoureux, 573 A.2d 1176, 1179 (R.I. 1990)).

It is the duty of the trial justice to "instruct the jury on the law to be applied to the issues raised by the parties." Figuereo, 31 A.3d at 1290 (quoting State v. Adefusika, 989 A.2d 467, 477 (R.I. 2010)). Significantly, however, "[w]hile a defendant may request that the trial justice include particular language in the jury instructions, the trial justice is not required to use any specific words or phrases when instructing the jury—so long as the instructions actually given adequately cover the law." Id. (quoting Adefusika, 989 A.2d at 477).

Before this Court, defendant argues that the trial justice erred in failing to give his requested instruction regarding accuracy versus certainty.[11] An examination of the jury

---

[11] In addition to requesting the same instructions given by the trial justice in State v. Figuereo, 31 A.3d 1283, 1290-91 (R.I. 2011), defendant requested that the trial justice in the present case give a thirteen-page instruction based on those submitted by the Innocence Project pursuant to the New Jersey Supreme Court opinion in State v. Henderson, 27 A.3d 872 (N.J. 2011). The latter instructions rely on the scientific and psychological studies regarding eyewitness identification that the New Jersey Supreme Court found credible, but that this Court has consistently rejected. See State v. Sabetta, 680 A.2d 927, 933 (R.I. 1996) (finding that trial justice did not abuse discretion in excluding the testimony of a proposed expert witness because eyewitness testimony and memory are within the comprehension of jurors and because such testimony would confuse

- 14 -

instructions given in the present case, however, reveals that the trial justice actually presented the jury with guidance on the requested issues. He gave an instruction that the jury may consider potential issues such as the "witness's state of mind at the time of the offense, and other circumstances affecting the witness's opportunity to observe the person committing the offense that you deem relevant." Further, the trial justice instructed that the jury may consider "the certainty or lack of certainty expressed by the witness at the time of the identification, * * * and any other circumstances bearing on the reliability of the witness's identification that you * * * deem relevant." Finally, the instructions concluded with the direction that, in order to convict defendant, "the jury must be satisfied beyond a reasonable doubt of the accuracy of the identification * * *."

Despite the defendant's protestations, it is evident that the given instruction presented "the jury with the essence of [the] defendant's requested instruction." Figuereo, 31 A.3d at 1290. While the trial justice did not use all of the specifically requested language, he clearly conveyed the message that the jurors should scrutinize the complaining witness's accuracy and that, "[i]f the circumstances of the identification of the Defendant are not convincing beyond a reasonable doubt then you must find the Defendant not guilty." See id. at 1291; see also Imbruglia, 913 A.2d at 1033 (finding no error in a set of jury instructions in which trial justice "'fairly covered' the concept expressed by [the proposed phraseology]"). After careful review of the evidence, we conclude that the jury instructions adequately covered the law concerning eyewitness identification.

rather than assist the jury); see also State v. Gomes, 604 A.2d 1249, 1256 (R.I. 1992) (holding that there was no abuse of discretion in trial justice excluding introduction of evidence concerning unreliability of eyewitness testimony because it could only confuse or mislead the jury).

## IV

## Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court, and we remand the record in this case to that tribunal.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**    State v. Robert Austin.

**CASE NO:**    No. 2013-77-C.A.
(P2/11-160-A)

**COURT:**    Supreme Court

**DATE OPINION FILED:**  May 1, 2015

**JUSTICES:**    Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**    Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice William E. Carnes, Jr.

**ATTORNEYS ON APPEAL:**

For State:  Jane M. McSoley
            Department of Attorney General

For Defendant:  Lara E. Montecalvo
                Office of the Public Defender